The Judges delivered their opinions.*
Judge Garrí
This case comes up on two Exceptions taken to Opinions o? the Court below. William Trigg, being indebted to James C Anthony between two and three thousand dollars, executed to him a Deed of Trust on twelve negroes as a security for the debt: an advertisement and sale took place under the Deed of trust; and Mark Anthony a brother of James and brother-in-law of Trigg, becam the purchaser of all fhe slaves for the súm of $ 2,747 50, ovevgoin the debt and interest due on the Deed $97 21. The Trastes; executed a Bill of Sale to the purchaser, and the slaves were returned <■) fc£) to the possession of 'Trigg, who lived on a tract of land then rented by the purchaser. The sale took pla-ce May 23d, 1S12, *290 and the slaves remained with Trigg for the rest of the year'. In the beginning of the next year, they were taken by Anthony from the possession of Trigg, and placed under his own overseer; still, however, on the samé plantation where they had lived the last year, which Anthony had again rented, and on which Trigg continued to reside. On the 38th of January, 1813, an Execution issued from the Office of Bedford couuty, in the name of Pleasant Creery against Trigg, and was levied on one of the slaves bought by Anthony under the Deed of Trust; and then in possession of his overseer. The Sheriff returned, levied and not time to sell; a venditioni issued, and was returned satisfied. Anthony brought trespass against the Sheriff for seizure and sale of the slave. The Defence was placed on the ground of fraud, not in the origin of the transaction, (for, it seems agreed on all hands, that the Deed was fairly executed to secure a just debt,) but in the sale under the Deed. The first effort of the Defendant was to prove, that for some time previous to the sale, Marls Anthony and Trigg were united in a common design to protect the property of Trigg (who was deeply in debt,) from his creditors; that to this end, they in 1811, borrowed of James Austin ■and John Anthony two bonds, executed by them to Marls Anthony for 450/. each, with the avowed purpose of raising money on them, to relieve Trigg’s negroes from the Deed to J. C. Anthony; that to secure these bonds, they executed a Deed of Trust on Trigg’s slaves, (included in the first Deed,) and on several slaves,&c. of M. Anthony; that a considerable sum of money was raised on the bonds, and that Marls-Anthony remitted money to James C. Anthony; but how much was not proved, nor that it was on account of Trigg’s debt, Mark Anthony being also in debt to J. C. Anthony. That on the day of sale, Mark Anthony appeared as a creditor of James C. An-an order from him for the whole of the though he was, not long before, his debtor. That though the Deed of Trust was made to two Trustees, who were to act jointly, yet when only one appeared on the day of salo, TWgg removed the difficulty, by giving him a written power to proceed aIone. These facts being proved, the Defendant offered to examine a witness, to prove that he had attended with the intention of buying one of the slaves, but was taken out by Trigg, and requested not to bid for them; for, that Mark Anthony was to buy the property for him. This evidence being objected to, the Court sustained the objection, unless it could be shown, that Mark Anthony was privy, or in some way assented, to Trigg’s statement. 1 think this evidence ought to have been admitted, it is laid down in many cases, that “a community of interest or design, will frequently *291 make the' declarations of one, the declarations of all.” (See 2 Stark. on Evid. 44, and the cases there cited.) And this is not confined to contracts, but extends to trespasses, and-even crimes of the highest grade. (See Stark, on Evid. 47, and the cases.) In the case before us, the Court had to judge for itself, whether such a community of purpose, between Trigg anil Anthofvjl was proved, as laid at propeygfound for admitting the decbrratious |f one, to be evidence Against thither. I think there wasigíich pr<-|f, and therefore, that ,the evidence should not have been rejected. There is another ground. A transaction consists often of various parta, which, connected together, form the whole. Thus, in the question of fraud, you can hardly ever establish it by direct and positive proof. You must collect the acts, circumstances and declarations of the parties concerned. So far as these form a part, and assist in giving character to the transaction, they are good evidence.. Such facts, declarations, &c. are called part of the res gesta. Thus, when the character of a particular act is questioned, the declaration of the party doing it, made at the moment, is evidence to explain it. As in the case of bankruptcy, the declaration of the made when his house, is evidence to explain the meaning of his absenting himself. Oil the same ground, it was held in Lord George Gordon’s Case, that the cry of the mob might be received as part of the transaction. In these cases, the weight of the evidence does not depend on the credit of the witness, but on its connection with the circumstances. (See 2 Stark, on Evid. 46-7-8.) In the case before us, a public sale of twelve negroes had been advertised to be sold at a certain place in the Town of Lynchburg. This would naturally collect people, and we know from the record, that some did attend besides the immediate parties. Yet, we hear of no bidder but Mark Anthony. It is natural ask, how this happened? Suppose it could be proved, that there were twenty persons present, and that each of them had been requested by TV/gg not to bid, because Murk Anthony was to buy for him. Would not this account for the fact, and go far to give a character to the transaction? . Look, too, at the situation of Tj’igg. He was the owner of the slaves, deeply interested, (if the sale was real,) in raising up bidders, and enhancing the price of ev-ery slave. Does not such a man hold an important station in such a transaction? And are not his acts and declarations, done and made at the moment, during the progress of the sale, a very material part of it? The very sale itself would not have been made by one Trustee, without his leave. I think (then, on both these grounds, the evidence was clearly admissible. The second exception is, on account of an instruction, given by the Court to the Jury. That was *292 to this effect, that if Trigg had individually sold the slave fu v‘Intico • Ay, and had afterwards remained in possession, this would have been fraud per se; but that if the slave was sold by the Trustee, under the. Deed, delivered by him to the purchaser A nihony, and a Deed made to him, and afterwards suffered by Anthony to remain in possession, of Trigg for the year 1812: This was not per sec fraudulent, “ so as to subject said slave to the creditors of Trigg in the year 1S13, it then, in the actual possession of Anthony. ”
I do not consider this instruction as raising the simple question of fraud per se, decided in Edwards v. Harben, and many other cases; admitting as dered this case an exception, and that is the point for our consideration. For my view of the general doctrine of fraud per se, I refer to my opinion in the case of Land v. Jeffries, 5 Rand. 211, with the single remark in addition, that I agree fully to the rule of Edwards v. Harben, “That the absolute transfer of personal chatties without, a delivery of possession, is in Law fraud per se;” but, I add, that this being a legal presumption, is not absolutely conclusive as to fraud, but may be explained; and where this explanation is satisfactory to prove the perfect fairness of the transaction, and that the inconsistency of title and possession formed no part of the original contract, the case is taken out of the rule, and I refer to 2 Stark, on Evid. 617-18-19-20, and the cases there, to show that I am supported in this position by that excellent writer, and also by some of the ablest Judges who have sat on the English Dench. Passing the general question by: The opinion of the Court below presents two points interesting and important in their character. 1st. Does the sale of a slave by a Trustee under a Deed of Trust, and a delivery of possession by him to the buyer with a Bill of Sale, so change the ■property, that the buyer may suffer the slave to return to the possession of the former owner, without danger of coming within the rule of Edwards v. Harben? 2d. If possession of the slave do not accompany and follow the conveyance, but yet the purchaser takes possession before the issuing an Execution by a creditor of the vendor, can such Execution he levied on the property in possession of the purchaser? I would not be understood to give a decided opinion on either of these points, because I think the cause may be decided without it; but, on the first, (as it was discussed at the Bar, and will, I understand, bo noticed by some of my brethren,) 1 will give my presnt impressions, in Kidd v. Rawlinson, 2 Bos. & Pull. 59, it is decided, that if Lt. buy the goods of B., sold by a Sheriff under an Execution, be may suffer them to remain in possession of B., without subjecting thorn to B’s creditors. The circttm *294 stances distinguishing this from Twyne’s Case,-seem, 1st. The publicity of the sale: 2dly. That the purchaser was not a creditor: 3d. That the sale was not by the party himself, but by the Sheriff. “The object of the Statute (as is well observed by Slarkle, 2 vol. 620,) was to prevent covinous and fraudulent sales by the oioner to the prejudice of creditors, and not, as it seems, to sales made by a third person, as a Sheriff under an Execution, or a Landlord under a Distress, without proof of some fraud or collusion on the part of the owner, which in effect, makes such a sale his own act.” The case of Guthrie et al. v. Wood, 1 Starkie’s Cases, 367; 2 C. L. R. 430; was shortly this: Eastman, a packer, assigned the goods in question to W., as Trustee for II; to secure the paymr-rt of an annuity sold by R. to il; remaining in possession'# he ait Awards assigned his counting-house, fixtures, and utensils u'i itfade, to Guthrie and others, for the benefit of his creditors. E. remained in possession of the goods, and Pearson, the Landlord, sent in a Distress for rent, and the goods in question were sold under the Distress, and purchased by Guthrie with the funds of the creditors, for whom he was Trus,tee, and for their aecount. The goods were still suffered to remain in possession of Eastman, and they werd seized under an Execution at the suit of W., as Trustee for II, and Guthrie brought trover against Wood, to recover their value. After argument by Scarlet and Spanieie, for the Plaintiffs. Marryait and Comyn, for the Defendant, Lord E-Llenbouodgh said, “I had supposed that evidence would have been given of some collusion on the part of Pearson, the Landlord, with the Plaintiff; but nothing of this kind appears. The Plaintiffs acquired a property in the goods by purchasing them at the sale under the Distress. Guthrie, as a Trustee, was not on that account precluded from becoming a purchaser; he purchas-. nd them as any other person might havedonc; and though lie had laken the money with which he purchased them from the strong box of another, that would not have vitiated the sale. His motive for buying was, that the goods might not be removed from the premises, but might remain there for the benefit of the creditors, and he was quite at liberty, if he chose, to leave Eastman in the possession. The doctrine of possession applies to cases of conveyance from the party himself The Statute of Eliz. does not apply to a case like this, where the property is sold not by the party, but under a Distress for vent.” See. also, Meggot v. Mills, 1 Lord Raym. 286; Cole v. Davies, Id. 724; Watkins v. Birch, 4 Taunt. 823; Steel v. Brown, 1 Taunt. 361. These are most of them cases under Executions, or Distress warrants, but the following comes nearer to the question betm'o i.r:, Leonard v. Baker 1 Man. & Sel. 251: One Clee, the *295 husband of the Plaintiff’s mother, assigned his effects to Trustees for the benefit of creditors, and absconded, leaving his wife in possession of his house, and goods at Pcrshore, and notice of such assignment was advertised in the newspaper, and the goods were afterwards sold by the Trustees, at public auction; and the Plaintiff purchased thera in order to accommodate his mother, and paid for them at a fair valuation, and removed some, but left the greater part in her possession, she continuing to reside in the house, and take in lodgers as before, and at the ensuing Michaelmas, he also took the house of the Land - lord, at an advanced rent. In the December following Collins’i) Execution was levied on the goods, when the Plaintiff gave notice to the Sheriff, that the goods were his property, under the appraisement and sale, which was the first time that Collins was apprised of that circumstance. The Plaintiff brought Trover against the Sheriff, The Judge at Nisi Prius, left it to the Jury to consider: 1st. Whether the change of property by the assignment, and subsequent sale made to the Plaintiff, was notorious at Pershore; upon which the found in the affirmative: And Whether the assignment had been executed with an intent to defeat either the general body of creditors, or any particular creditor: The Jury found in the negative, whereupon, a verdict was found for the Plaintiff.
Jervis moved to set aside the verdict, and enter a non-suit, on the ground that it was improperly left to the Jury to say, whether the change of property was notorious, there being no evidence of any change of property at all; inasmuch as Clee’s wife was suffered to continue in possession of the goods, after the assignment to the Trustees, and after the sale to the Plaintiff, precisely in the same manner as before. The Court were unanimous against the motion. Lord Ellenbqkough said, “ I think the verdict is according to the law and the facts, as they appeared to the Jury. As to the point respecting the change of property; what was done respecting it, was not done secretly, but the Trust Deed was known and advertised in the. public papers; and the sale under it was by public auction. The Trustees, indeed, for a time allow the wife to continue in possession after the assignment; and do not themselves interfere with the goods by removing them, except on occasion of the man’s coming in and taking away the saw; which, however, is a circumstance in the case, although I do not much rely upon it; hut when the sale took place, the Plointiff removed a part of the goods, and the rest only he suffered to remain with his mother for her accommodation. At all events, an effectual change took place in September, when the house was re-taken by the Plaintiff, at an advanced rent; but it seems to there was a dona before-that time: to hold other *296 wise would be to pronounce that a person could not make a bona fide purchase of goods in the possession of another for his accommodation, and for the purpose of continuing them in the same possession.” This seems to me a very strong case, and accords with my ideas of sound and the of the Statute. Where a fair, open, public sale of a man’s property is made by a third whether as Sheriff, Bailiff or Trustee, it never could he the intention of the Statute to prevent a friend from buying as the highest bidder, paying his money, and then leaving the property with the former owner. Deeds of Trust, with us, “take effect as to subsequent purchasers for valuable consideration, without notice, and as to all creditors, from the time when such Deeds shall have been acknowledged, proved, or certified according to Law, and delivered to the Clei'k of the proper county to be recorded,” and this Court has, in many cases, laid it down that the Trustee is the agent of both parties: leaving, therefore, the questions of fraud and collusion to depend on tffe evidence, and to be decided by the Jury in each particular case,[I think that as a general question of Law, we may pronounce, that a fair sale, under a fair Deed of Trust, does so change the property, that the purchaser may permit it to return to, and remain with the former owner, without subjecting it to be taken for his debtsp unless it be suffered to remain with him more than five years.
I have thus given my opinion on these questions, taking them in the point of view in which they were passed upon by the Court below, and discussed at the Bar here. But, there is an aspect of the case which seems to me conclusive, and renders all the points made, and the Opinions given in the Court below, immaterial and irrelavent. The Deed of Trust from Trigg to James C. Anthony, seems agreed on all hands to have been fairly executed, to secure a just debt. In Shep. Touch. 67; Estwick v. Caillaud, 5 Term Rep. 425, and other cases, it is said, “ that the question whether a Deed be legal or not, depends on the intention of the parties, at the time ivhen it ivas executed: and that when a conveyance is not .fraudulent at the time of making it, it shall never be said to be fraudulent for any matter ex post fade.” Now, the sale was either fair, and must stand good, or it was fraudulent and void; if good, the Sheriff of course was a trespasser, in taking the property. But how, if it was void? Why then it seems to me, that being a mere nullity, it leaves the Deed of Trust in full force and vigor. I do not mean to say, that as to Trigg, the sale is a nullity; for, though fraudulent, it would be binding on him; he could not be heard to impeach it. But, putting the sale out of the waj of creditors, would not the Deed of Trust still operate to shield the pro *298 perty from their Executions? That properly is last bound for the debt of James C. Anthony. If, after a fair application of it to that debt, any surplus should remain,- this would be a fund to which the creditors of Trigg ought to have resort, and could have resprt: but it cannot be reached by Execution, for it is an equitable and contingent interest
I think, therefore, that .whether the sale were good or bad, the slave was not liable to Execution, and the Sheriff was a ticspassev; that, in this point of view, the Opinions of the Court furnish no ground for reversing the Judgment, and that it must be affirmed.
Judge Gkeen.
The Appellee brought this action against the Appellant, a Sheriff, who levied an Execution against Trigg on, and sold, a slave, which the Plaintiff alleges belongs to him. The Plaintiff claimed ?he slaw;, as a purchaser of that and other slaves from a Trustee to whom Trigg, the brother-in-Law of the Appellee, had eonwyed them, for securing a debt lo James C. Anthony, a brother of the Appellee. The slave conveyed, had remained until the day of sale ?.n the possession of Trigg, who lived on a tract of land rented by the Appellee. At the salt- on the 21st May, 1812, the Appellee ¡purchased all the slaves embraced in the Deed of Trust, at a sum a little short of the amount, of the debt for which they were pledged, but paid no money'; James C. Anthony having given an order, directing the money to be paid to the Appellee. After the sale, the slaves returned to the possession of Trigg, who kept them in his possession until the end of the year 1812, when they were put under an overseer, employed by the Appellee to manage the plantation on which Trigg resided, and still continued to reside, when the Sheriff levied the Execution on the slave in question, it being the same plantation before rented by the Appellee, and which he had íented for the year 181:1. The negro was taken by the Sheriff from the possession of the overseer early in ISIS, but: it does not appear when the Execution was issued, or delivered to the Sheriff, or levied. The Appellee had r>rocured, before the sale by the Trustee, the bond of another person, for the avowed purpose of raising money to pay Trigg's debt to James C. Anthony; and he and 2Wgg gave a Deed of Trust upon the slaves of Trigg embraced in the former Deed of Trust, and upon some of the Appellee’s property, to indemnify the person who had given his bond to the Appellee. Money was raised upon this bond, to what amount does not appear, and money was remitted by the Appellee to James C. A?. *299 thony, but to what amount does not appear, he being also indebted ' to Sames, C. Anthony. All this was done.before the salo by thvTruslee. The Appellee paid the amount of the bond which he had borrowed, to the holder. On the day of ?.de under the Reed o'.' Trust, one only of two joint Trustees named in the .Deed being present, Trigg gave his consent in writing, that the single Truest; should make the salo, in the absence of the other. Evidence w;r-given of this fact, and that Trigg was much in debt. The Befen ■ dant offered to prove by a witness, that he attended the salo under the Deed of Trust, intending to purchase some of the negroes, but was prevented from bidding; by Trigg’.? toiling him, that the Plain, tiff was purchasing them for him. This evidence was rejected by the Court as inadmissible, to which the Defendant excepted.
Whenever the question, whether any evidence offered is, or is not admissible, depends on other fans already proved, the Court, whose province it is to decide the question as to its admissibility, must of necessity judge and determine th; c-ibct of the evideace offered to prove the fact upon which that question depends.
In this case, I think it clear that the Appellee and Trigg acted in . concert for the purpose of effecting a common object Whether ilia falx’ and' honest object of disposing of the trust property, for the purpose of satisfying ins debt to James C. Anthony, and consequently, to deprive Trigg of all interest in the property disposed of for that purpose; or, under colour of a sale, to. defeat the just claim of Trigg’s creditors, to have satisfaction of their debts out of the sen - plus of the trust property, after a fair disposition of so much of it as ■ might be necessary to satisfy the debt for which it was pledged, by procuring a feigned sale of the whole for the amount of the debt, and securing the whole of it to the use of Trigg, subject only as bo-, fore, to the payment of the original debt, or so much of it as was really due, thus really preserving, whilst apparently extinguishing, Trigg’.? interest in the jiroperty. These wore questions for :he Jü ■ ry, to be determined upon the weight they might give to the facts, if they were proved to their satisfaction, namely, the pecuniary embarrassments of Trigg, the connection of the parties concerned, the promotion of the sale by the voluntary act of Trigg, which resulted .apparently in the total loss of all his interest in the property, whilst ho still continued to enjoy it, and that no money was ¡laid on the sale; and upon the fact, if the evidence offered to prove it was ad • missible, and credited, that he interposed to prevent the property from selling for a better price. In order to determine whether this evklence was or was not admissible, it devolved on the Court to do - *300 termine, for itself, not for the Jury, whether the other facts were sufficiently proved, and whether these facts were prima facie sufficient proof, that the parties had combined to effect the fraudulent design of defeating the rights of TVigg’s creditors in the manner above stated. And if so, then the proof of Trigg’s interposition to prevent a real sale to a stranger to these contrivances, was admissible evidence against the Appellee, not because it was necessary, in order to satisfy the Court as to the fraudulent design of the transaction, of which the Jury was finally to judge, but as fit evidence to be considered by the Jury, in forming their judgment upon the whole case. Nor is this an improper interference, on the part of the Court, with the province of the Jury, but the necessary effect of the constitution of our Judicial Tribunals, consisting of Courts and Juries. It is well settled, that in the case of several combining for an illegal purpose, the acts and declarations of each in respect to the common object, are evidence against the others; yet, before such evidence can be admitted, the Court must decide for itself, that there is sufficient evidence prima facie, to prove such a combination, which the Jury may nevertheless negative. 2 Stark, on Evid. 44, 47: Rex v. Inhabitants of Hardwick, 11 East. 584; Rex v. Stone, 6 Term Rep. 527; Phillips’ Law of Ev. 71-2-3.
If it were otherwise relevant to the issue, this evidence ought, I think, to have been admitted, not to prove that in truth the purchase was made for Trigg, but as proof of his act, tending to prevent a competition in the sale, from which the fraudulent intent aforesaid might be inferred.
( The enquiry as to the propriety of the instruction given by the Court, presents the question, as to the doctrine of fraud per se, a few years since thought to be conclusively settled by an uniform course of decisions in England, and in the Supreme Court of the U. S., and now thought (as seems to me without good reason,) to be entirely unsettled and doubtful. This doctrine is deeply founded in the early principles of the Common Law, and declared and enforced by many ancient Statutes. It proceeds on the ground, that a possession and use of the property professedly transferred to another, inconsistent with the professed object of the transaction, is conclusive proof of a secret trust for the original owner, and therefore fraudulent as to his creditors, and liable to their Executions. >
As early as the 1st of Rich. 3, provisions were made by a Statute intended to protect purchasers against secret Uses, now called Trusts. This was effected by declaring that the conveyance of the cestui qui trust, whether the use were secret or open, should pass the legal title as against the Feoffee to the use, and all *302 claiming under him, subsequent to the disposition of the piopcrty by the cestui qui use.
The Statute of 3 Hen. 7, ch. 4, enacts, that (< all .Deeds of Gift of goods and chattels, made in trust to 1 lie use of the grantor, to defraud creditors, shall be void.” 13 Vin. Abr. 517, pl. 1. The Statute of 50. Edward 3, ch. G, provided, that “ fraudulent assurances of lands, or goods, to deceive creditors, shall bo void, and they may have Execution thereof, as if no such gift had been made.” This Statute was the first in order, and applied only to debtors who fled to Sanctuaries. That of Rich. 3, applied only to land, and chattels reíd, conveyed to the use of the grantor, and that of Hen. 7, only to the case of goods and chattels conveyed by the grantor, in trust for himself. These Statutes applj mg only to particular eases, the 13th of Elizabeth was enacted, in terms which embraced all conveyances, suits, bonds, judgments, anil executions, intended to defraud creditors, and avoided them as to the creditors thereby defrauded; and this Státute we have introduced into our Code. These Statutes against Fraud have always been held to be declaratory of the Common Law, with this difference, that at Common Law, no one ,:ould complain of any fraud, unless he had an existing right wheft -he fraud was committed, which was prejudiced by it; whereas, the Statutes enabled any subsequent creditor to impeach the fraudulent transaction, if there were any other creditor at the time, who might be defrauded by it. 3 Co. Rep. 83-3, Twyne’s Case.
It. is observable, that two of these Statutes were pointed particularly to the cases of frauds practised by means of secret trusts; the most ready expedient, and the must commonly resorted to, for • petrating frauds, indeed almost the only one. The real object of those transactions being, in general to preserve the perly, the of the debtor, against the claims of his credí» tors, by representing it as belonging to another, whilst he enjoys the use of it: accordingly, the Courts must have considered the continued possession, and use of the property, by the debtor, notwithstanding an absolute transfer in form to another, as a proof of a secret Trust, and therefore fraudulent and void, as to creditors, under the Statutes of Rich. 3, and Hen. 7, and a fortiori, under that of 13 Eliz., and also by the Common Law. So confirmed was this doctrine in the time of Elizabeth, that in Twyne’s Case, it was treat-id as a settled doctrine, that wherever there was any trust for the .lonor, there was fraud against creditors, and that possession by the donor was considered as conclusive evidence of fraud. A gift to a fliild, was considered as fraudulent and void, not because it was voluntar}’', and without, valuable consideration, but because a trust was *303 inferred, that the “ child, in consideration of the gift being voluntarily and freely given to him, and also in consideration of nature, would relieve his father, and not see him.want, who had made such a gift to him. ” Indeed the drift of the argument in that ease, is net *o show that a secret trust avoids the transfer of the property, as being conclusive evidence of fraud,but taking that for granted,to show that if fhere is any trust whatever, express or implied, (the distinction batween which is carefully explained,) the conveyance does not coma within the proviso of the Statute, which excepts from its operation bona fide conveyances only. One of the reasons for the Judgment in that ease, was, “Here was a trust between the parties, for the donor possessed all, and used them- as his own proper goods;” and “every gift made on a trust, is out of this proviso, for that which between donor and donee is called a trust, per nomen speciosum, is in truth, as to all the creditors, a fraud;” and “the continuance of the possession-in the donor, is a sign of trust”
From the manner in which the subject is treated in this case, and the terms of the Statute of Hen. 7, I should think that the decision was founded upon along and well-settled doctrine, that a continued possession, inconsistent with the professed purpose of I he transaction, was a fraud per se, that is, conclusive evidence of a trust, and therefore, a fraud. However this may be, this doctrine, which is called the rule of Edwards v. Harben, comparatively a veiy modern case, has never been questioned in England, or here, until very recently. This was the doctrine held in Stone v. Grubham, 2 Bulst. 226; in 12 Jas. 1; and Hungerford v. Earle, 2 Vern. 262, in 1692, and in Bucknall v. Roiston, Ch. Prec. 287, in 1709. In the latter case, Sir Edward Northey said, that it had been ¡ uled so forty times, in his experience at Guildhall. This was also the doctrino in the Supreme Court of the U. S., in Hamilton v. Russell, 1 Cranch. 310, and has been repeatedly affirmed in thiiOourt, without exception or reserve. Fitzhugh v. Anderson, 2 H. & M. 303; Alexander v. Deneale, 2 Munf. 341; Robertson v. Ewell, 3 Munf. 1; Thomas v. Soper, 5 Munf. 28; Williamson v. Farley, Gilm. 15. The decisions elsewhere, which are supposed io be modifications of, or exceptions to, this rule, are not so. Iiral! those cases, the possession was not inconsistent with the professed purposes of the transaction, as if the sale be conditional, or the situation of the parties or property be such, as that it cannot be conveniently delivered to the purchaser, so it be delivered as soon a3 it conveniently can; or, it is avowedly ¡aledged as a security for the payment of debts, by being conveyed to Trustees for that puruihse; in all cf these, and such like cases, the possession is not ineo> *304 aistent, and tine character of fraud is not necessarily stamped ujftin if. This-rule is so fortified by the most venerable authority, and so well-founded in justice, and sound policy, that I should be very reluctant to depart from it lightly, or to fritter it away hy refined dis • •tinctions. -,
'¡'he only circumstances which can he alleged , s taking this case out of the rule, are, that the legal titic to the slaves was in the Trustee, who transferred it to the Appellee; that a large sum of money, secured by the Deed of Trust, was really due, either to James C. Anthony, or to the'Appellee, if he had paid it to James C. Anthony, and that the Appellee had taken possession of the property before the Execution was levied. The circumstance, that there wás a real debt due from Trigg, is of no consequence in itself; lor, if a true creditor uses his debt in any way to cover the property of his debtor, and protect it from his other creditors, and with that intent, his title is void for fraud, so far as other creditors are impeded hy it; as if accreditor, who has an Execution levied on the property of his debtor, directs the Sheriff not to sell it, but to leave it in the debtor’s possession, a trust is implied as a matter of law, his Execu - tion is fraudulent, and any other creditor may take the property in execution.'- 13 Vin. Abr. 524, pl. 3. In Twyne’s Case, there was a real debt due to the purchaser of the debtor’s property, and the Court said that it was net within the proviso of the 13th Elizabeth, which excepts conveyances made bona fide, and upon good consideration, “for, although it is on a true and good consideration, yet it is not bona fide, for no gift shall be deemed bona fide within the said proviso, which is accompanied with any trust: as if a man be indebted to five several persons, in the several sums of 20/., and hath goods of the value of 20/., and makes a gift of all his goods to one of them in satisfaction of his debt, but there is a trust between them, that the donee shall deal favorably with him, in regard of his poor estate, either to permit the donor, or some other for him, or for his. benefilytó use, or have possession of them, and is contented that he, shall pay him his debt when he is able; this shall not be called bona • fide within the said proviso.’.’
¡Nor does the fact, that the Appellee had taken possession of the property, the Execution was levied, prevent the operarion of of the rule. That founded the legal inference, from the continued possession, that there was a se.cret trusf between the parties for the benefit of the debtor, it attaches upon all cases in which the possession has 'continued beyond •die time, when the property might convcnicnt.lv have been deliver *306 ed to tlfc purchaser, and the possession of the purchaser after the presumption of Law is fixed upon'the transaction, cannot'impair the force of that presumption; Accordingly in Edwards v. Harben the rule was applied to the purchaser, as Executor1 de son tort, taking possession after the death of the debtor, who had continued in the.-, possession only a few days after the sale. If the possession of the debtor be such, as that, during' that possession, a creditor might have-taken the property in Execution upon the ground that such possession made the conveyance fraudulent per se, and void in its inception, the change of possession could not make that good which ivas already void, and a creditor may take in Execution property IVaudulently conveyed, and in possession of the fraudulent donee. -
The remaining question, as to the effect of the Deed of Trust, which was valid in its inception, is important, and in respect to which, ,s.o far as I am informed, we have no satisfactory precedents. I do not moan the question, whether a sale under a Deed of Trust is, as a sale under an Execution, exempted from the operation of the rule of Edwards v. Harben; but the question, whether applying.Jhai rule, and finding that the sale under the Deed of-Trust was fraudulent, it should be held that the property is liable to creditors, as if the Deed had never been made-; or, vacating the sale only, the creditor should be restored only to his original right-to have satisfaction out of the surplus of the property left, after satisfying the debt for which it was pledged.
In the ease of Hungerford v. Earle, 8 Vern. 261, (in 1693,) Commissioner Hutchins held, that a Deed not at first fraudulent may afterwards become so, by being concealed, or not pursued, by which means creditors are drawn in to lend their money. No Decree was, however, pronounced, but an issue was directed to try the question of fraud, the event of which is no where reported This dictum is approved by Chancellor Kent (whose opinions are entitled to great respect,) in Hildreth v. Sands, 2 John. Ch. Rep. 35. On the other hand, it was held in Stone v. Grubham, in 1815, before cited, and in Dews v. Brandt, Select Ch. Cases, 7, in the 11th year of George the first, by Raymond and Gilbert, Commissioners, that a Deed not fraudulent in its inception, could not become so by matter subsequent. And in this opinion I agree. The very terms of the Statute require that the conveyance, or security, shall, to render it void, be had or made with intent to defraud creditors or purchasers. Although a Deed valid in its inception is not rendered void at Law under tho Statute, by using it for a fraudulent purpose, yet a Court of Equity, acting upon its general principles, would pm it out of the way of a creditor, cr purchaser, so far, if that were er_ *307 tireiy, as might be necessary to put the party affected by it in the same situation in which he would have been but for the fraud.
I should consider the continued possession of Trigg in this case, as per se, making the sale under the Deed of Trust fraudulent and void, so far as it affected his interest ip the trust property which was intended to be withdrawn, under colour of that sale, from the just claims of his creditors; a sale under á Deed of Trust, when no money is paid, being different in principle from a sale under Execution where the money is paid; the public officer performing his duty according to Law, and the Trustee acting as the agent of both debtor and creditor, according to their directions, if they concur in them, as in this case they did. Other views, however, render it unnecessary to pursue this branch of the subject.
The Deed of Trust being valid,,although used for a fraudulent purpose, and the sale under the Deed of Trust being fraudulent, and therefore void as to creditors, but good as between the parties, the case in effect is that of a mortgagee of personal property in possession, the mortgagor having an interest in it, to the extent of the surplus which may remain after payment of the debt, liable to his creditors in some form. And the question is, whether such interest is the subject of an Execution upon a Judgment at Law.
The 30th section of our Statute of Conveyances, provides, that estates of every kind holden or possessed in trust, shall be subject to the debts and charges of the cestui qui trust in like manner, as if he owned the interest in the things so holden or possessed, as lie owns in the uses or trusts thereof. ' This provision embraces those of the Statute of Richard 3, before referred to, and of the 10th section of the Statute of Frauds of the 29th Charles 2, combined, in respect- to lands and chattels real, to which only they extend. A conveyance of personal properly, or chattels jreal, by the legal owner, in which there is any trust for the owner, is void as to creditors, under the Statutes of Hen. 7, and 13th Eliz., and by the Common Law; hut, personal properly conveyed by a third person in trust for a debtor) or by a debtor in trust for the payment of debts, is not in England liable to an Execution on a Judgment against the <xstu> qui trust, either by force of-any of those Statutes, or by the Oommon Law as has been there decided.
Our Statute, I think, goes further, and provides for this case. The terms, “estates of every kind, holden or possessed in trust;” “the ■'kings holden or possessed,” which are not found in the Statute of Rich. 3, and Chas. 2, were I think, intended to embrace all possible descriptions of property, real and personal: and this construction :s strongly fortified by the fact, that the Statute concerning joint *309 rights ami obligations, prepared by the same Rovisors who prepai’ed 1 his Act, has the same expression, (“the estates or things holden, or possessed,”) applied clearly by the context to personal property. But, still it can apply to no case where the cestui qui trust has not an immediate equitable right (o the possession and enjoyment of the property; for, if it were a remainder, or contingent, as such a right, if legal, would not .be subject. to Execution until it fell into possession, so neither would such a trust. Trigg, having no immediate right, and none until the debt for which the property was pledged was satisfied, and the surplus ascertained, the Sheriff had no legal authority to take it from the possession of the Appellee, and was a trespasser. In this view, the evidence of Trigg’s interposition to prevent competition, had no tendency to justify the levying of the Execution on the slave, and ivas therefore properly rejected, it being irrelevant to the matter in issue. And for the same reason, and not for those assigned by the Court, the instructions excepted to, dedaring that iu- a cm tain st'./o of facts, the sale would not be fraudulent per sc, afford no ground for reversing the Judgment, since each of them ’was qualified by the expression “so as to subject the said 'dare to the creditors of tibe said Trigg,” which was true. The cre■.ditor, whose Execution was .levied on this slave, mistook his remedy. That was in a Court of Chancery, to have the debt due on the Deed of Trust ascertained, the property sold, the debt paid, and the .balance, if any, applied towards the satisfaction of his Execution.
The Judgment should be affirmed.
Judge CoaXiTsk.
There arc two Pulls 6f Exceptions: one as to the rejection of evidence offered by the Appellant: the other in regard to an instruction -is to the Law, given by the Court to the Jury. They both have reference to the same statement of facts, and I will consider the last first.
The Bill of Exceptions gives a summary of what was proved be-fare the Jury, from which it appears that one Trigg, being indebted to Tames C. Anthony, in the sum of ‘32,080 29, executed a Deed of Trust on sunthy t-Iavcs; that Mark Anthony, the Appellee, and who was l.roíLcr-in-hiw of Trigg, was also indebted to James C. Anthony; fuA vLhing to assist Trigg, he procured Tames Austin and John .Anthony, to execute two bonds; one for 450L, payable the Jam-cry, 1312, and the other for 450J., payable the 19th Janusiy, 1513. The object, it seems, was to sell, those LonJc, and df the IP ' f'f-up. Trv¿" rpd 2f.urh An *310 thony executed a Deed of Trust, to save harmless Austin and John Anthony, as to the bonds so given by them. In this Deed was comprised the slaves in the Deed of Trust to James C. Anthony, and also some slaves and lands belonging to Mark Anthony. , A considerable sum, it appears, was raised on the bonds, but what amount was not proved; and about the time, Mark Anthony made considerable payments, but to what amount does not appear, to Janies C. Anthony, in his own name. No credit appeal's to have been entered on the Deed of Trust. These bonds were executed on the 20ih August, 1811: when the money was raised on them, does not appear.
On .the 23d May, 1812, William Milche.ll, one of the Trustees in James XJ. Anthony’s Deed, with the assent of Trigg, advertised and sold tile slaves in that Deed, and Mark ' Anthony became the purchaser, received possession, and a Bill of Sale from the Trustee, The slaves were thereupon returned to the plantation of the1 Appellee, whereon Trigg lived, being a plantation which the Appellee had rented for the years 1811,1812, and 1813; and it is stated, that it did not appear that Trigg interfered at all with the negroes. It was also proved, that in the year 1813, the Appellee employed an overseer for the said plantation, and placed under him the slaves purchased by him as aforesaid, and that none of them were subject to the control of Trigg, but were entirely under the control of the Appellee and his overseer, from whose one of them was taken under Execution as the property of Trigg; and for which alleged trespass this action is brought. The Execution bears date on the 28th January, 1813; but when it came to the possession of the Sheriff, or was levied, does not appear.
There is no proof whatever, nor any ground whereon to raise r. suspicion, that this plantation was rented for Trigg, and that he was the real owner of the lease. On the contrary, it seems that he had not at any time any control over it, or the,slaves on it, and that he certainly had none during the year ISIS. There seems to have been no question raised, but that the overseer, from whose possession the slave was taken, was there during the whole of the year 1813; and of course, that he was so in possession when the Execution issued. It was clearly so understood by the Judge, and no dispute at all raised on that point. Whatever might have been the case, then, in 1812, the purchaser clearly-had possession during the whole of the year 1813, and of course, before the Execution issued. I think the Judge was right in his instruction given as to the Law on this state of the facts. But. 'Vs was a o’.ibl5 - c.ti -. widm' An of Trust, hv ono having the *311 legal tille; and who, Trigg having assented to dispense with the presence of the other Trustee, was authorised by that assent, and the terms of the Deed, to make the sale. He did so, delivered possession, and conveyed the legal title from him, so far as he conld convey it. As at present advised, I am unable to distinguish such a caso as this from a sale under execution, or for rent; and if the purchaser in such latter case might permit the former proprietor to remain in possession, without being subject to the doctrine of fraud per se, I cannot see why he might not in this case.
It is truc, a sale under a Deed of Trust, or even under an Execution, may be a mere cover to a fraudulent and secret trust for the. benefit of the alleged debtor; but, such open and public transactions as these, are not, it seems tó me, within the operation of the rule, aforesaid. I therefore at that the was the other branch of his instruction; and that such possession as Was proved to be in Trigg in 1812, was only a circumstance which might avail with others to prove actual fraud in the transaction; and was, therefore, properly left to the Jury for that purpose, and that only. This alleged actual fraud the Jury negative by their verdict.
But, the other Bill of Exceptions shews, that evidence going to prove actual fraud, and combination to defeat creditors, was rejected, and the question is, was the testimony offered, properly rejected or not?
In considering this point, it seems to me that James C. Jlnthony must be taken to be a bona fide creditor of Trigg to the amount of $2,650 29, for the payment of which the sale was made.
The Plaintiff was his Agent, and receiver of this money on the day of sale, and became the purchaser of the property. It would seem that Trigg was his debtor also, on account of the transactions in relation to the bonds which were sold as aforesaid, and which the Appellee has since paid off in the bands of (he holders.
The property incumbered by Trigg to James C. Jlnthony, and which was sold as aforesaid, was the only property which stood between the Appellee and harm, and he may be considered a second incumbrance on it, for his indemnity. Pie received the amount the bonds sold for, but he was to take in those bonds or his estate would suffer. The incumbered property of Trigg was to be applied first to take them in. If it proved insufficient, he would lose the difference between what the bonds were sold for, and what he had to pay for them. It was natural, and proper then, for him to get himself into such a situation, that he could bid at the sale without havina; to advance the monrv, to the full extent of the inevru *312 ferance, se as to purchase in, and make his second incumbrance cover whatever the slaves might be worth, to have what they would sell for in cash. He could have laid up under the second incumbrance too, so as to save his own property so dar harmless in regard to. the bonds, and the Deed of Trust afetesaid. Had he been in no wise connected with Trigg, this course would have tended to produce the best possible sale.. It ivas the natural and proper course, according to the evidence, had he been a stranger. But,,he was the brother-in-law of Tr>gg, in addition to which he hail permitted 2>igg to live on his plantation, and Trigg had agreed that one Trustee might proceed to sell. If, in addition to this; it had appeared that the negroes were worth more in cash than both the incumbrances, and that if he could get them in, without paying more for them, he might aid Trigg in future, there would he some ground to suspect that in fact it had been agreed, that if he could so get them in, he would hold them for,his benefit, to the extent that their real value exceeded both debts.
Had there been proof then, of the amount the bonds sold for, so as to show what was the extent of both debts, and that the real cash-value of the slaves exceeded that amount to any considerable extent so as to fnake a project of this kind really available to him, the near connection, and friendship between the parties, might have led to a. suspicion of such combination. But, neither the extent of the debts, nor the real cash value of the slaves is proved. They scent to have been set up singly, except one family; and sold for considerable prices. And it does not appear hut that they were sold for full prices: nothing appears to the contrary. They may have sold for more than they could have been, sold for, had not the Appellee; had it in his power to bid to the extent of the debts aforesaid. •,There is no unfairness of conduct imputed to' the Trustee. He knew of no fraud or combination, but sold for as much as he could get.
If, however, there was in reality nothing due on those Deeds of Trust; if they have been merely used as a cover, to enable the Appellee to purchase in this property, and cover it for Trigg, creditors might have enquired into it on a hill for that purpose, or perhaps might have proved it in this suit; but, there being no proof of fraud or combination, we ought not to suspect it, merely on the ground of the connexion subsisting between the parties. Acts of benevolence from one connexion towards another ought not to he repressed, for fear of imputations of this kind, unless they can. be supported by pregnant circumstances-.
Under this state of the evidence, William Leftioich is introduced v prove, “ that he attended the sale under th,e .Deed of Trust, with *314 intent to purchase one of the slaves; that he was taken out by Trigg? who requested him not to bid for the slaves, stating that the Appellee was to buy the property for him, the said Trigg.” This evidence was rejected, unless it could be shown, that the Appellee was privy to Trigg’s statement, or in other manner consented to it.
The witness does not even state, that he forbore to bid, if that would have made any difference, or that this was generally understood, and the biddings repressed; or that the Trustee knew or suspeeted it, or that the slave he intended to bid for, or any other slave, was sold for less than he would have been willing to give.
- This evidence was oiFered as the declaration of one of two confederates in an unlawful act; but, before such evidence can be given, there must be proof of the confederacy, of which proof the Court is to judge. The declarations of a third party not on oath, are not evidence, until by some legal evidence the combination is proved. •That cannot be proved by declarations not on oath, in order to let in those very declarations as proof before the Jury. Neither Court nor Jury are to hear such declarations, until a foundation is- laid for their introduction. Here, the only evidence of fraud or combina • lion is the say so of Trigg. This I think was properly rejected.
The Judgment must be affirmed,
Judge Cabell.
The Deed of Trust executed by William Trigg, for securing the debt due by to Anthony, Trigg an. equitable and contingent interest in the property conveyed by the Deed of Trust: and such an interest is not liable to execution. The opinions given by the Judge during the progress of tho cause, could not, therefore, even if they be erroneous, (as to which, however, I express no opinion,.) furnish any ground for reversing 'he Judgment.
In the case of Land v. Jeffries, (See Appendix to 5th Rand. p. 580,) I had occasion to express, at large my opinions on what is commonly called il the rule of fraud per seas also on the cxcop - lions to it. It cannot he necessary to repeat them here.

'F!’e PnESTi'T.xT ,absent.