## ABNEY v. KINGSLAND & CO.

1. The declarations made by a party while in possession of property, that he held the same in his own right, or under another, is admissible evidence, as part of the *res gestae* ; but it is not permissible to prove every thing he may have said in respect to the title; as, that the property was acquired *bona fide*, and for a valuable consideration, was paid for by the money of a third person, or his own.

2. Where evidence is pertinent, but insufficient, the court should not assume that the party has no further proof to adduce, and reject it; but, if it is *prima facie* irrelevant, it is incumbent upon the party offering it, to show how it may become relevant by connecting it with other facts, and if this is not done, it should not be received.

3. Where there is no evidence to implicate the claimant of property in the purpose of the defendant in execution to defraud his creditors, the declarations of the defendant, indicating a fraudulent design on his own part, are not admissible against the claimant ; and the error of admitting such testimony cannot be cured by the court's directing the jury to disregard it, unless they believed from *all the facts and circumstances,* that the claimant participated in the defendant's intention to delay, hinder or defraud his creditors.

4. It cannot be assumed from the fact, that the father manifested an intention to defraud his creditors, that he therefore furnished his son, (who had no visible resources,) with the money with which the latter purchased some five or six hundred dollars worth of the father's property, which was sold under execution ; especially where it appeared, that the son, who was twenty-two or three years of age, had been engaged as a clerk in a store, and afterwards was a partner in a " drug store" upon his own account. Nor does the fact that the purchase money was paid by the claimant's brother, show, that the funds of the former were not used, or that their father provided them.

5. *Semble :* the continuance in possession of personal property, after the same has been publicly sold under execution, and purchased by a third person, is not even *prima facie* evidence of fraud, so as to subject it to the creditors of the defendant in execution.

6. If a defendant in execution furnished to a third person, the money with which he purchases the property of the former at a sheriff's sale, the title thus acquired by the purchaser will not prevail against the creditors of the party advancing the money, although it is good against him ; but if such fraudulent vendee makes a *bona fide* sale of the property to one ignorant of

the fraud, the latter will hold it against all persons in whose favor liens had not previously attached.

7. Where one makes a fraudulent purchase of property, which he exchanges for something else of the same description, the substituted property will stand in the place of that originally acquired, and be liable in the same manner to the creditors of the vendor. If, however, the property received in exchange was most valuable, and the vendee paid the difference in value, a court of equity would give him a lien for his reimbursement.

8. *Quere.* Can the interest which one acquires by hiring a slave for a year, or shorter period, under a contract to pay wages as they are earned, or at some future time be levied on and sold under execution to pay his debt?

Writ of Error to the Circuit Court of Sumter.

On the first day of August, 1843, a writ of *fieri facias* was issued from the county court of Sumter, at the suit of the defendants in error, against the goods and chattels, &c. of M. Abney, and levied in November following, by the sheriff of that county, on a negro man named York, who was claimed by the plaintiff in error, and bond given to try the right, pursuant to statute. An issue was accordingly made up and submitted to a jury, who returned a verdict declaring the slave liable to the satisfaction of the execution, and judgment was rendered accordingly.

Pending the trial, the claimant excepted to the ruling of the court. It is shown by the bill of exceptions, that the plaintiffs introduced a witness, who testified that the possession of the slave York was in the defendant in execution at the time of the levy ; and on cross-examination it was proved that the claimant purchased a slave named Ned, at a sale made by the witness as deputy sheriff, under a *fieri facias* against the estate of the defendant in execution ; and that Ned had been exchanged for York.

Witness then stated, upon being interrogated by the plaintiffs, that he was deputy sheriff, and went, about three weeks before the sale of Ned, to the house of the defendant in execution, to levy the *fi. fa.* under which he was sold ; that while there the latter told witness he wished him to levy the execution on Ned, that claimant might buy him at the sale for

his (defendant's) benefit, so as to secure him against his creditors ; defendant at the same time remarked, that he had the money in his pocket to pay for Ned, which he had procured from Joseph Dial. Witness further stated that at the time of this conversation, Ned was in the possession of the defendant in execution. To the admission of this evidence the claimant objected ; but his objection was overruled—the court remarking, that the jury should be instructed, unless from all the facts and circumstances of the case, they believed that the claimant was aware of the intentions of the defendant in execution, and participated with him in the fraud, the declarations of the latter were not admissible against him.

It was also shown by evidence, adduced on the part of the plaintiffs, that the claimant was a young man about twenty-three years of age at the time of the purchase of Ned, without any visible property. The only means of which the witnesses were aware, that claimant had of acquiring money, was, that previous to the purchase, he had lived about ten months as a clerk in a store, and afterwards did a moderate business as a partner with one Smith, in a drug store in Tuskaloosa. After ceasing to do business at the last named place, claimant went to Mississippi, but whether previous or subsequent to the levy of the execution in the present case, does not appear.

It was further proved, that Ned returned immediately after the sale to the plantation and possession of the defendant in execution, and so remained until the claimant exchanged him for the slave York, now in controversy : that York when acquired, also went to the plantation and possession of the defendant, and so continued until the levy of the *fi. fa.* in question.

Although Ned was bid off by the claimant, the purchase money was paid by another son of the defendant, who a short time previous to the levy on York, carried off some slaves of the defendant to Texas. The value of York was six hundred dollars.

Evidence was adduced by the claimant, tending to show that the money with which Ned was purchased, was obtained upon paper made at his instance, and for his benefit, with-

out any agency or concern of the defendant; *Further*, that the claimant exchanged Ned for York with Patrick Brown, who was not apprized of any fraud between claimant and his father, but made the exchange *bona fide*.

It was also proved by the claimant he had hired York to his father, the defendant in execution.

The court instructed the jury as follows, viz :

1. If they believed the sale of Ned was made to hinder, delay or defraud the creditors of the defendant in execution, and that the claimant was aware of, and participated in such intention ; or that he was purchased by the claimant at the sheriff's sale with the defendant's money, then the sale was void as to the creditors of the latter.

2. If Ned was purchased by the claimant in fraud of the defendant's creditors, and was afterwards exchanged by him for York, the latter slave would stand in the place of the former, and be liable in the same manner to the plaintiff's execution ; and this although Brown, from whom York was obtained, may have acted in good faith, and in ignorance of any previous fraud on the part of the claimant.

3. If they believed that York was, at the time of the levy, hired to the defendant in execution for a term not then expired, they must find for the plaintiffs ; but if their verdict was found upon the hiring, they should say so—if on the charges respecting the fraud, they need say nothing about the hiring.

BLISS & BALDWIN, for the plaintiff's in error, made the following points :

1. The declarations of the defendant in execution were not admissible. They did not relate to the title, and were not made in the presence of the claimant : they did not constitute a part of the *res gestae*. [8 Ala. Rep. 652.]

2. Conceding that the exchange of Ned was void within the statute of frauds, as it respects the creditors of the defendant in execution, it by no means follows that York stands in the same predicament. It is not pretended that Brown acted with a dishonest intention in the exchange, or that the claimant's purpose was to carry out a preconceived design to defraud. Whatever therefore, may have been the original

intent of the claimant, it does not appear to have been conti-
nued, and the charge upon this point is consequently errone-
ous.    [2 Brev. Rep. 252.] The defendant in execution, even
if the purchase of Ned was the result of a fraudulent combi-
nation between himself and the claimant, lost all title to the
slave, and his creditors cannot, unless the facts bring the case
within the statute of frauds, subject York to the payment of
their debts.    That the claimant might, in the proper form of
proceedings, have been compelled to account for the value of
Ned, if the hypothesis assumed in the charge be true, is not
denied.

3. The interest which one has in a slave, which he has
hired, cannot be sold under an execution against him.  How-
ever the law may be in respect to chattels generally, the con-
dition of slaves forbid it.    But if the law be otherwise, there
was no issue, nor could have been any which allows such an
interest to be subjected.    [8 Ala. Rep. 434.]

R. H. SMITH, for the defendants in error, contended, that
an unexpired term of a legal interest in personal property was
subject to levy and sale under execution ; and that the issue
and verdict in the present case were entirely proper.  [5 Ala.
Rep. 664; Id. 770·] The defendant in execution was in
possession when his declarations, as related by the deputy
sheriff, were made ; consequently they were part of the *res
gestæ: besides*, it was allowable to prove fraud on the part of
the defendant in execution, and then, by distinct evidence,
show the participation of the claimant.    [3 Ala. Rep. 529; 4
Id. 40 ; 8 Id. 107, 112, 113.] If the purchase of Ned was
fraudulent, it was void as to creditors, and if York was ac-
quired by exchanging him, he too is liable to the payment of
the debts of the defendant in execution, in the same manner
manner that Ned was.    [8 Ala. R. 694, 710.]

COLLIER, C. J.—The declarations of the defendant in
execution made to the deputy sheriff a short time previous to
the levy on Ned were certainly inadmissible.    True, it has
been often held, that what a person in the possession of real
or personal estate says, in respect to the same, are admissible
as part of the *res gestæ*.    But in McBride and wife v. Thomp-

son, (8 Ala. R. 650,) we said, " it is not to be understood that such declarations are admissible to every conceivable extent." That " the affirmation of the party in possession, that he held in his own right, or under another, is proper evidence as part of the *res gestæ*, which *res gestæ* is his continuous possession ; but his declarations beyond this, are no part of the *subject matter*, or *thing done*, and cannot be received as such. While it is allowable to prove the statements of one in possession, and explanatory thereof, it is not permissible to show every thing that may have been said by him in respect to the title ; as that it was acquired *bona fide*, and for a valuable consideration ; was paid for by the money of a third person, or his own," &c.

In the case before us, the defendant expressed a wish that the deputy sheriff should levy on Ned, that the claimant might purchase him for his (defendant's) benefit, and secure him against creditors—remarking that he had the money in his pocket, for that purpose, &c. The mere statement of the facts is sufficient to show that they are incompetent evidence within the principle of the case cited. The remark made by the court, that the jury should be instructed to disregard the testimony, unless they believed from all the facts and circumstances, that the claimant participated in the fraudulent purpose of the defendant in execution, can't *per se* divest the decision of the circuit court of error. Where evidence is pertinent, but insufficient in itself, the court should not assume that the party has no other proof to adduce, and reject it ; but where it is *prima facie* irrelevant, the person offering the evidence should show how it could be made relevant, by connecting it with other facts and circumstances ; if this is not done, the court should refuse to receive it. [4 Porter's Rep. 321 ; 1 Ala. Rep. N. S. 506, 540 ; 3 Id. 16 ; 5 Id. 531 ; 6 Id. 390, 407 ; 7 Id. 457, 698.] There is nothing in the record to indicate that any "facts and circumstances" were adduced previous to the admission of the defendant's declarations, to implicate the claimant in the intention to defraud defendant's creditors ; and unless the court was then informed that they would be offered, these declarations should have been excluded. We will, however, consider whether the testimony subsequently given, shows the participation of the

claimant, and whether the legal assumption of the court can be sustained by it.

It may be laid down as a settled principle, that where several persons are proved to have combined together for the same illegal purpose, any thing said or done by one of the party, in pursuance of the original concerted plan, and with reference to the common object, is in reason and legal contemplation the act of all; and therefore will be evidence against any or all of the parties. [1 Phil. Ev. 94-5, and cases there cited. See also, 2 Carr. & P. Rep. 232, 432.] This principle applies with all force to wrongs or injuries for which the law provides a remedy by action merely. Thus, where one indemnifies a sheriff against an act which turns out to be a wrong, it was said the admissions of the former were receivable to charge the sheriff. [4 Wend. Rep. 335; see 2 J. J. Marsh. Rep. 256; 4 Carr. & P. Rep. 375.]

Proof of connection is always an essential preliminary addressed to the court, to let in acts and declarations of a joint wrong doer against his fellow; but it has been held, that the testimony of one witness is enough for this purpose, and that the court will not decide on his credibility. Thus where it appeared that the prisoner said to the witness, in the presence of R, that one F had offered him a sum of money, if he would kill W, and the prisoner told F he would give him an answer at a subsequent time; that the prisoner offered the witness a third part of the money if he would commit the murder; that R proposed a mode of doing it; that the witness declined having any thing to do with it, and then the prisoner said he was in jest; and in a few days after the murder was actually perpetrated by F. *Held*, sufficient proof that the prisoner and R entered into the conspiracy to let in the declarations of R as evidence against the prisoner. [10 Pick. 497.] So in Clayton v. Anthony, 6 Rand. Rep. 285, which was an action of trespass by the plaintiff, against the sheriff, for levying on a slave under a *fi. fa.* against Trigg—after the latter being insolvent, had conveyed the slave, with eleven others, in trust, to satisfy a debt due to the plaintiff, and they had been sold to the plaintiff at auction, where there were but few bidders. The possession of the slaves was not changed until

some time after the sale, and there were other circumstances showing that there was a fraud in the sale. On the part of the sheriff, it was offered to prove Trigg's private request to a bidder at the trust sale, to forbear, as the plaintiff was bidding for his (Trigg's) benefit: *Held,* that the court was to judge of the circumstances by which a community of design between the plaintiff and Trigg, to defraud Trigg's creditors was attempted to be shown; and being satisfactory, the declarations of Trigg were admissible, though the plaintiff was not present. And where a judgment was entered on a bond and warrant of attorney against the father, in favor of the son, a combination between them having been proved to defraud the creditors of the former, the creditors were permitted to give in evidence declarations by the father, in the absence of the son, that the bond was given for the sole purpose of keeping off creditors, and that it was without consideration. [1 Rawle's Rep. 362; 8 Ala. Rep. 104.]

Placing out of view the declarations of the defendant in execution, and the question is, does the other testimony in the cause establish a combination between him and the claimant to defraud his creditors. The testimony upon this point may be thus condensed: the claimant, at the time of the sale under execution, was a young man, about twenty three years of age, without any visible means—he had been a clerk in a store for ten months, and afterwards did a moderate business as a partner in a drug store: *Further,* that the money with which Ned was purchased, was obtained upon paper made at his instance and for his benefit, "without any agency or ownership on the part of the defendant in execution;" that although the slave was bid off by the claimant, the purchase money was paid by his brother, who a short time previous to the levy on *York,* carried off some slaves of their father to Texas. Ned returned to the plantation of the defendant in execution shortly after he was purchased by the claimant, and when exchanged for York, the latter went there in his stead; and it was proved had been hired to the defendant. We cannot think that these facts warrant the inference that the claimant lent himself to assist his father in the perpetration of a fraud, so as to legalize the admission of the declarations of the latter. Now, conceding that the claimant was a

young man without visible resources, yet he may have had credit, or the credit of friends may have enabled him to effect the loan of a sum sufficient to purchase the slave; keeping out of view what the defendant in execution said to the deputy sheriff, as we must, in considering the effect of the preliminary proof, and this latter supposition is reasonable inference.

The fact that the purchase money was paid by the claimant's brother does not show that the funds of the former were not used, or that their father provided them. This brother had not carried his father's slaves to Texas until Ned had been sold under execution—in fact, not until a short time previous to the levy on York. And it does not appear, that these slaves had been sold, or money obtained by any disposition of them.

It is admitted that an *absolute transfer* of personal chattels without the delivery of possession, is *prima facie* evidence of fraud; but it may be asked, does this rule apply to a sale of goods under execution, where a person other than a creditor becomes the purchaser? Does not the notoriety and publicity of the sale exempt the case from its application? These questions have been heretofore considered by us. See also, Kidd v. Rawlinson, 2 Boss. & P. Rep 59; 2 Starkie's Ev. 617 to 622. But if the fact of the defendant in execution continuing in possession under such circumstances, was in law a badge of fraud, would it be sufficient, in the absence of proof of fraud in fact, to establish a combination between the father and son; or if it would, does not his proof of hiring satisfactorily account for the possession? Without stopping to give a special answer to each of these questions, we think there is an entire want of proof to implicate the claimant in the intention to aid the defendant in execution in defrauding his creditors; and consequently there is no foundation upon which to rest the admissibility of the declarations of the latter.

If the defendant in execution furnished the money with which Ned was paid for, under the purchase at the sheriff's sale, and was intended to be benefitted, although the bill of sale was made to the claimant, *eo nomine*, there can be no pretence that the title acquired by the latter will prevail a-

gainst the creditors of the defendant. Notwithstanding this is the law in respect to his creditors, the defendant who is a *particeps fraudis*, could not successfully assert a right to the slave against the claimant. *In pari delicto melior est conditio passidentis.* [5 Binn. Rep. 109; 2 Hill's S. C. Rep. 488; 7 Johns. Rep. 161; 1 Blackf. Rep. 262.] But if a party make a sale of property for a valuable consideration, which he had acquired through the fraud of his vendor, to a person ignorant of the fraud, such purchaser shall hold the property against all the world, if no paramount liens had attached. If then, Brown made a *bona fide* exchange with the claimant, of York for Ned, without notice of the fraud, if any, by which the claimant acquired Ned, his title is not only superior to that of the defendant in execution, but to his general creditors also. [2 Root's Rep. 359; 10 Johns. Rep. 185; 12 Pick. Rep. 307; 1 Dev. & Bat. Rep. 29.]

Having determined that the purchase of chattels with the money of a defendant in execution, with a view to his benefit, is fraudulent, as it respects his creditors, we will consider whether, if these chattels are exchanged for others, the substituted property remains in the same condition, and may be seized by the creditors. Assuming the exchange of slaves to have been in good faith, and without notice on the part of Brown of the fraud attributed to the claimant, we have seen that his title to Ned will prevail, not only against the defendant in execution, but also against his creditors. If the claimant acquired a better title to York that he had to Ned, then it would be competent for a fraudulent vendee to defeat the creditors of his vendor, by a mere exchange of the property, and become himself the absolute owner of what he received in its stead. The statement of such a proposition is quite enough to induce its repudiation. If the purchase of Ned was void against the creditors of the defendant in execution, because he was paid for with the money of the latter, upon principles of moral justice, it would seem that York should stand in the same situation; and assuming that the claimant's purchase had not the effect of divesting the title of the defendant in execution, as it respects the creditors of the latter, and we cannot avoid the conclusion that he should not be permitted to profit by it to their prejudice. If the fraudulent

vendee sells or exchanges the subject of his purchase, it is conceded that he is, notwithstanding, accountable to the creditors; and if he receives in exchange something that is tangible, and susceptible of identification, why should it not be seized under legal process? This view, we think, was sustained in Marriott & Hardesty, et al. v. Givens, 8 Ala. Rep. 710-11—a case in equity, and we can conceive of no reason why it should not be recognized at law. If York is more valuable than Ned, and the claimant made them equal by the payment of something else, *perhaps* a court of equity would give the claimant a lien for his reimbursement *pro tanto.*

There can be no doubt, that in general, an estate in personal property for a limited period, is subject to levy and sale under execution. Yet it does not necessarily follow, that the interest which one acquires by hiring a slave for a year, or a shorter period, under a contract to pay wages as they are earned, or at some future time, may be thus seized and disposed of. However the law may be upon this point, we do not, in the condition of the case before us, deem it necessary to inquire. The jury found the slave liable to the execution, and assessed his full value, and the term of hiring has most probably expired, so that the question can only be material, (if at all,) on a second trial, with the view to adjudge the payment of costs.

For the error of the circuit court upon the first point examined, its judgment is reversed, and the cause remanded.