NEWCOMBE vs. J. W. & R. LEAVITT.

1. An execution creates a lien on the personal property of the debtor within the body of the county to which it runs, from the date of its receipt by the sheriff; and if executions are regularly issued from term to term, the lien is not lost, but suspended merely, by the removol of the property from one county to another within the State.

2. The statute of limitations, so far as it affects rights to personal chattels, acts not merely upon the remedies for their recovery, but upon the title itself, so that a title vicious in its inception ripens into a perfect one by mere lapse of time.

3. When personal property to which a lien has attached by the delivery of an execution to the sheriff, is removed to another State, where it is acquired and held by a *bona fide* purchaser until the statute of limitations of that State has barred its recovery, and then is brought back by him to this State, his title is perfect against the execution creditor, although he has had executions regularly issued from term to term.

4. On a trial of the right of property in slaves, the declarations of the defendant in execution as to his intention in removing them beyond the limits of the State, made one or two days before their removal, are too remote from the actual removal to form part of the *res gestae*, and are therefore not admissible evidence for the plaintiff.

5. Declarations of the defendant in execution showing a fraudulent intent on his part, are not admissible evidence against the claimant, unless he or some one through whom he claims was connected with the fraud.

ERROR to the Circuit Court of Sumter.

Tried before the Hon. TURNER REAVIS.

This was a TRIAL OF THE RIGHT OF PROPERTY in certain slaves, which were levied on under an execution in favor of the defendants in error, as the property of Elias C. Fields, and were claimed by the plaintiff in error under the statute.

On the trial a bill of exceptions was allowed, which shows that the first execution issued on the judgment of the defendants in error, came to the sheriff's hands in Greene county, where the said Fields lived, on the 20th of February, 1843, and was renewed from term to term regularly until 1848, when, on the 20th of November in the latter year, the levy was made on the property in question in Sumter county. The plaintiffs "introduced testimony tending to show that the negroes levied upon were in Greene county on the said 20th of February, 1843, and until the 25th day of March thereafter,

and were the property of Elias C. Fields, one of the defendants in execution; that they were taken from Greene county on or about the 25th of March, 1843, by one Abner Jack, to the State of Mississippi, where he resides; that they were found on the 20th of November, 1848, in the possession of the claimant in Sumter county, Alabama, and there levied upon."

"The claimant then introduced testimony to show that one James Jack purchased the negroes of said Fields for a valuable consideration, and sold them to said Abner Jack, and that said Abner Jack, before the 20th day of February, 1843, took them to Mississippi, where he resided; that the said Abner Jack kept them there until February 5th 1846, when he sold them to said Newcombe for other negroes in exchange; that the said Newcombe held, kept and used said negroes in the State of Mississippi, until the fall of the year, 1848, when he removed with them to Sumter county, Alabama." The claimant then introduced, and read without objection, the statute of the State of Mississippi in Hutchinson's code, showing that the statute of limitations of that State for actions of trover and detinue was three years.

The plaintiffs then offered proof tending to show, that said Fields, in 1843, and about the time said negroes were sent away, was largely indebted, or insolvent; and that said negroes were sent away from his plantation, or premises, in the night of the 20th of March, 1843.

The claimant then offered as a witness James Jack, who testified that he was a creditor of the said Fields, and took said negroes away, with the consent of said Fields, in order to sell them and apply the proceeds to the payment of his debt; that he took said negroes from said Fields at the price of $700, and by his agreement was to allow said Fields whatever sum they should bring above that price; that in the month of July, 1843, he had a settlement with the said Fields, and allowed him $800 for said negroes, being the sum for which he sold them to the said Abner Jack; that said witness and the said Abner Jack knew that the said Fields was insolvent, and the object of the witness in taking away the said negroes was to secure his own debt.

In connection with the testimony of this witness, the plain-

tiff proposed to prove by another witness what the said Fields said a day or two before the said negroes were taken away, and while the negroes were in his possession, as to his purpose and design to dispose of said negroes and send them out of the way. To the introduction of this testimony the claimant objected; but the court overruled the objection, and the witness deposed that said Fields, a day or two before said negroes were taken away, told him, they being alone, that executions were out against him, and would break him up, and that he wanted to save something and was going to send off said negroes. To this testimony the claimant again objected, and again moved its exclusion; but his motion was overruled, and he excepted.

The court charged the jury, in effect, that the only inquiry for them was, whether the negroes in controversy were the property of Fields on the 20th of February, 1843, and were in Greene county at that time; that if they were, a lien attached upon them in favor of the plaintiffs, which was not divested by their subsequent removal to, and *bona fide* sale in Mississippi; and that if the plaintiffs kept up their lien by having executions issued from time to time, and the slaves were brought back into this State, and after they were brought back the plaintiffs' execution was levied upon them, they were subject to it. But that if the jury were not satisfied that the slaves were in Greene county on the 20th of February, 1843, they must find the issue in favor of the claimant, whether there was fraud in the transaction between Fields and Jack or not.

The claimant requested the court to charge the jury, that if the negroes were in Mississippi on or before the 10th of July, 1843, and the said Abner Jack became the purchaser, *bona fide*, and held them in Mississippi until 5th February, 1846; and that the claimant purchased them of said Abner, *bona fide*, in said State, and held them there until the fall of the year 1848; and if the holding of each was under color of title, and adverse to all others; and if by the act of the legislature of Mississippi, passed February 4th, 1844, thereafter in force, the actions of trover, detrinue, &c., were barred by the lapse of three years after the right of action accrues, then the lien did not run against the claimant so as

41

to make the negroes subject to the execution under the levy made in November, 1848; which charge the court refused, and the claimant excepted.

The matters found in the bill of exceptions, in relation to the admission and exclusion of evidence, and the charges given and refused, are now assigned for error.

BLISS & BALDWIN, for plaintiff in error:

1. The court erred in permitting the declarations of Field to be given in evidence: 1. Because hearsay is not admissible. 1 Starkie's Ev. 43–4–5–6–7. 2. Because it was no part of the *res gestae.* The important inquiry was, whether the execution against Fields was out before the negroes were removed from the State; and plaintiffs were permitted to prove that Fields, before the removal of the slaves, said that executions were out against him. It was a declaration, not of a thing then doing or about to be done, but of a past fact or transaction. 15 Ala. Rep. 539; 19 ib. 723; 20 ib. 123; 3 Conn. 247.

2. If a lien attached in favor of the plaintiffs, it run out and expired with the life of that execution. The statute provides when the lien shall commence, but says nothing as to its duration, and leaves it in this respect as at common law; and at common law the lien expired with the execution. Union Bank v. McClung's Ex'r, 9 Humph. 91. The statute does not create a lien, nor does it extend or regulate it, except as between different execution creditors. It does not continue the lien against a *bona fide* purchaser in a foreign jurisdiction.

3. If the lien attached on the property within the limits of this State, yet it had no extra-territorial influence, and cannot override the *bona fide* sale and purchase made in another State, without notice, or collusion, or anything to put the purchaser on his guard. In these respects the case is entirely different from that of McMahan v. Greene, 12 Ala. 71. In that case, the facts furnish a strong presumption of fraud and collusion between the defendant in execution and the purchaser; and if that existed, the purchaser, who participated in the fraud, could not, under our adjudications, be protected in it; without that element, the case would not command the

assent of the profession. It is not the policy of the law to run liens, where there is nothing to admonish the purchaser, or put him on his guard, and where he purchases in good faith, without notice. 2 Sugden on Vendors, top page 82; 6 Binn. 118; 1 Story's Equity 121 § 108; 10 Yerger 186; 2 S. & M. 108.

4. But this case not only differs from McMahan v. Greene, *supra*, in the absence of fraud on the part part of Newcombe, and want of notice; but it falls within the very exception pointed out in that case. It presents the case of a perfect statutory bar, accruing in the foreign State, while the prop erty was held there. Hutchinson's Miss. Code, 830 § 4; 12 Ala. 71; 15 ib. 194, and cases cited. The adverse possession of Jack may be united to that of the claimant, in making out the time. Angell on Limitations, 447·§ 34, and note to 449; 8 Cranch 462; 1 Wheaton 292; 1 M. & M. 296.

5. If the possession had commenced in fraud even, it would not prevent the running of the statute. 9 Vermont 110; 17 Wendell 202.

S. F. HALE, *contra:*

1. The declaration of Fields whilst he had the property in his possession, and after the rights of plaintiffs in execution had attached, tending to show fraud in the contemplated sale of the property, is admissible evidence against his vendee and those claiming under him, having first shown a combination, *prima facie*, to commit the fraud. 1 Green. Ev. 122 § 111; 15 Ala. 539; 8 ib. 104; 6 Rand. 291.

2. This evidence was admissible as a part of the *res gestae*, to explain and show the intent of the act he was about doing. Newman v. Stretch, 1 M. & M. 338, or 22 E. C. L. R. 330; Bateman v. Bailey, 3 Durn. & E. 256; 11 Pick. 365; 11 E. C. L. R. 498.

3. If the ruling of the court on the charges given and refused, can be sustained, the admission of this testimony, even if erroneous, could work no injury to the claimant, as plaintiff's right to recover is placed on grounds entirely independent of it; and error, without injury, will not reverse. 14 Ala. 182; 16 ib. 326; 20 ib. 121.

4. An execution from a court of record creates a lien upon

the personal property of the defendant in the county to which it issues, from the time of its delivery to the sheriff; and a purchaser thereof, though *bona fide*, for valuable consideration, and without notice, takes it subject to such lien. 2 Hawks 341; 3 ib. 293; 16 Johns. 287; 1 Dana 359; 1 Bailey 237; 8 Iredell 65; 4 Dev. & Bat. 169.

5. The lien created by an original execution, is preserved by the regular issue of *alias* executions from term to term, and is not lost by the removal of the property out of the county or State, and its sale there, if the plaintiff keeps executions regularly issued and in the hands of the sheriff. 4 Stew. & P. 238; 5 Ala. 44; 7 ib. 632; 12 ib. 71; 1 Dana 428; 1 B. Monroe 208; 3 Hawks 293; Story's Conflict of Laws 335 § 402.

6. The lien created by an execution, is a mere right, acquired by plaintiff, to have his debt satisfied out of the property; but without a levy it does not divest the title of the defendant in execution, or vest any title either in the sheriff or the plaintiff, so as to enable either one of them to maintain an action for its recovery or value. 6 Hals. 218; 12 Johns. 403; 1 Bailey 237; 12 Ala. 71.

7. The statute of limitations never begins to run until there is some one in being capable of suing; for, until that time no action accrues. 18 Ala. 831; 5 Barn. & Adol. 204; Angell on Limitations 55. As neither the plaintiff, nor sheriff, nor any one else, could sue for this property, or in any way pursue it in Mississippi, the statute could not run against the plaintiff's rights, as he is not embraced in its provisions. The rule established by the authorities above cited is, that, when a lien has attached, it continues until the debt is satisfied, or until it is lost by plaintiff's default.

GIBBONS, J.—It is the settled law in the State of Alabama, that an execution creates a lien from the date of its receipt by the sheriff, on the personal property of the debtor, within the body of the county to which it runs. It is also settled by judicial decision, that this lien is not lost, but suspended merely, by a removal of the property from the county where the lien first attached to another county in the State, if the creditor permits no term to elapse without the issue of an

execution. Hill v. Slaughter, 7 Ala. 632. It is also decided in the case of McMahan v. Greene, 12 Ala. 71, that the lien created by the issue of an execution is not defeated by the removal of the property beyond the borders of the State and a sale of it there, if the purchaser brings it back to this State; and that the purchaser in the foreign jurisdiction, if he comes with the property to this State, cannot by such purchase defeat the lien which had been regularly continued by the issue of executions, as prescribed by our statutes. It is difficult to gather from the decision in this case the principle on which it rests. The facts of the case were, that a negro woman, on which a lien was created by the delivery of an execution to the sheriff in Pike county, was run off to Florida, and there sold to a purchaser, who bought with full notice of the circumstances under which she left Alabama. The purchaser brought the negro woman back to Pike county, and she was then seized by the sheriff, by virtue of an *alias* execution in his hands. The facts of the case do not show whether the sale was fraudulent or *bona fide*, other than that the purchaser bought with notice of the lien. Neither does the court state, with any distinctness, upon what ground it bases its decision. We cannot gather from the decision whether it was placed upon the ground that the sale, with notice of the lien, in the foreign jurisdiction, was a badge of fraud, and therefore the transaction was colorable; or, whether it was upon the ground, that the lien created by the execution followed the property, and therefore the purchaser took it *cum onere*. The latter idea, however, is somewhat negatived by the reasoning of the court.

The lien created on personal property by an execution, is dependent upon two facts, which must exist concurrently; the one, an execution in the hands of the sheriff, the other, the property of the debtor in the county where the execution is running. Either of these failing, no active lien exists.

Even after the lien has been created, if the property is removed from the county where it was created, the lien is said to be suspended, that is, the property does not carry the lien with it, as a right attached to it in favor of the creditor, but goes, liable merely to have it revived by the issue of another execution to the county where the property is carried. If

no execution is sent to that county, then the old lien created in the county from which the property is removed, is lost forever. Hill v. Slaughter, *supra*. This reasoning, applied to a case where the property had been removed beyond the limits of the State, would also tend to show, that, when the property passed the borders of the State, it passed divested of the lien entirely, as the process of this State could not run beyond its limits; and a *bona fide* purchaser for value would take it, as it would seem, in the condition in which he found it.

However this may be, we do not deem it necessary, in the present case, to express an opinion as to the correctness of the conclusions to which the court arrived in the case of McMahan v. Greene. Nor do we deem it necessary to decide what the right is, if any, that property on which a lien has been created, by placing an execution in the hands of the sheriff, carries with it when it is transported from the county in which the lien was created beyond the limits of the State. Our decision will be placed upon other grounds.

The proof in this cause discloses, that the statute of limitations in the State of Mississippi, for the recovery of personal property by action of trover, detinue, &c., is three years. This act was passed the 4th day of February, 1844. The proof further tends to show that James Jack, in 1843, after acquiring the negroes in question from Fields, the defendant in execution, sold them to Abner Jack, who held them until 1846, and then sold them to the claimant, who held them until 1848, and then brought them to Sumter county, Alabama; that both Abner Jack and the claimant resided in the State of Mississippi during the periods above named, and there held said negroes as their own, adversely to all the world. The material question arising upon this proof is, what effect has the lapse of time upon the title of the claimant, under the laws of Mississippi, and while the claimant and said Abner Jack, through whom he claims, remained in Mississippi with the property in question? and also, how is the plaintiff's lien affected by it?

The statute of limitations in all the States of this Union, so far as it affects rights to personal chattels, acts not merely upon the remedies for their recovery, but upon the title itself; so much so, that a title vicious in its inception, ripens into a

perfect one by mere lapse of time. It is emphatically a statute of repose, and should be upheld in all cases where it is invoked, if the principles by which it is governed are applicable to the case.

We apprehend it will not be denied, that where property is taken, even tortiously, from the real owner residing in one State, and carried into another and there sold to a *bona fide* purchaser for a valuable consideration without notice, such purchaser, after he has held the property adversely a sufficient length of time to make a title by the statute of limitations of the latter State, may defend it successfully, even against the true owner. This court has gone so far as to say, that such a purchaser could defend successfully, even though the title of his vendor had commenced by fraud, force or felony. Howell v. Hair, 15 Ala. 194, and cases cited. If this would be the law as to the actual owner of property, who had a perfect and complete right to it, when it left the State where he held it; on what principle of analogy or of right is it, that a party who claims a mere lien on property could stand in a higher or better position?

The statute of limitations, as we have above remarked, when it begins to run, acts upon the title of the property, and perfects it against all persons and claims whatsoever not excepted by it. Could it be contended, that, if this property had remained in the State of Alabama, and instead of being removed to another State, had been removed to another county, and there sold to a *bona fide* purchaser without notice, who had held it adversely to all the world for six years, such purchaser would not have a good title, although the lien of the execution had been regularly kept up in the county where it first attached, by the regular issue of executions from term to term? We could not hesitate, in such a case, to say that the creditor could not enforce the lien upon the property in the hands of such a purchaser, because time would have made him a title, independent of his purchase, and divested of all liens not duly recorded. Again; suppose this purchaser should afterwards take this property to the same county where the lien had first attached upon it, where an execution was still running on the same judgment, and that executions had been regularly continued from term to term up to that time;

could it be contended, that the old lien would be revived and re-attach to the property, so as to defeat the title which the statute had made for the purchaser? If so, then the statute, instead of being efficient for the repose and quietude of titles, would be rather a delusion. If such would be the effect of the statute in the State of Alabama, how much more forcible is the argument when applied to a title acquired by it out of the State?

But it is said, the statute did not begin to run against the creditor, and in favor of the claimant, in the State of Mississippi, because the lien created by the execution was not such a right as could be enforced in a foreign country; and that it was not such a right authorities are cited to prove.

As we have above stated, we do not pretend to decide in this case what right, if any, was attached to this property in favor of the plaintiff in execution, when it was carried beyond the limits of the State of Alabama. Assuming, however, that there was a right, we must suppose that there was some mode of enforcing it, in the forum to which the property was carried. It rarely happens, in any of the States of this Union, that a party having a right in any one of them, cannot find a remedy there to enforce it. The courts of each State, by comity, on principles of international law, lend themselves to enforce the rights of non-resident suitors, as they shall be found to exist; and if the right arose in a foreign jurisdiction, the inquiry which the courts make is, as to the existence of the right according to the law of the place where it is alleged to have arisen, giving to the party his remedy according as it is found to exist or not. Story's Conflict of Laws 335, § 402. If the party claiming such right, does not follow the property, and enforce it, but lets it remain in the hands of a *bona fide* purchaser, until by the law of the land time makes him a title good against all the world, he cannot complain that his rights are barred.

If, on the other hand, no right was attached to the property, by virtue of the execution lien, which followed it to the State of Mississippi, then there was nothing to enforce in the forums of that State, and the purchaser there would take it, like any other purchaser, from a vendor who had the right to sell it, and his title in that case would seem to be good, in spite of

the lien which had attached to the property before it left the county where the execution was running against it.

But in either case, the purchaser of the property would be entitled to the benefit of the statute of limitations, and this statute would make him a title, independent of his purchase, and against all other titles or claims not excepted by it.

We prefer placing our decision in this case upon this ground, because, in doing so, we make it consistent with the case of McMahan v. Greene, and, as above stated, we do not wish to be understood as expressing an opinion as to the correctness or incorrectness of that decision. That case seems expressly to provide for a case like the present, and to except from its influence a title acquired by the statute of limitations in a foreign country.

Our conclusion, then, is, that inasmuch as the charge of the court cut off the claimant from all benefit which he might have derived from his title by the statute of limitations, whilst the proof warranted him in availing himself of it, the court erred in its charge. The charge asked by the claimant stated the law correctly, and should have been given to the jury.

We think the court also erred in admitting the declarations of Fields, the defendant in execution, to be given in evidence to the jury. It appears by the bill of exceptions, that these declarations were made one or two days before the negroes were removed, and were made to the witness when he and the witness were alone together. This testimony was objectionable on two grounds: first, because it was too remote from the actual removal to form part of the *res gestœ*; and second, if it was given with a view to show a fraudulent intent on his part, it would be incompetent unless it was connected with the claimant or some one through whom he claimed. The rule is, that, although the vendor of property may act with a fraudulent intent in the sale or conveyance of it, still such sale or conveyance is not void, if the vendee or grantee acts *bona fide*. Both the vendor and vendee must participate in the fraud, in order to vitiate the sale.

The judgment of the court below is reversed, and the cause remanded.