## MAHONE vs. WILLIAMS.

[BILL IN EQUITY TO SET ASIDE SALE UNDER MORTGAGE.]

1. *Amendment of bill; terms of allowance not revisable.*—Under the act approved Feb. 8, 1858, (Session Acts 1857-8, p. 230,) the imposition of terms, as a condition precedent to the allowance of an amendment of the bill, is a matter of discretion with the chancellor, and is not revisable on error or appeal.

2. *Conclusiveness of agreement of record.*—Where terms are prescribed by the chancellor, as a condition precedent to the allowance of an amendment of the bill, and are accepted by the complainant, he is bound by his consent thus given, and cannot assign as error any of the matters covered by it.

3. *Declarations of vendor or mortgagee, as evidence against purchaser.*—The declarations of the mortgagee, made before the sale under the mortgage, expressing his intention to buy in the property at the sale through the agency of others, to restore it to the mortgagor's family, and to prevent other creditors from reaching it, are not competent evidence against the purchasers at the sale, on bill filed by the mortgagor, against them and the mortgagee jointly, to set aside the sale on the ground of fraud.

4. *Sale under mortgage; whether made for cash, or on credit.*—Where the mortgage provides for the sale of the property for cash, the mortgagor cannot complain that the mortgagee agreed to allow time to the purchaser: such an arrangement, whether made before or after

Mahone v. Williams.

the sale, could not possibly injure him, and, therefore, constitutes no ground for setting aside the sale.

5. *Same ; appropriation of proceeds.*—Where two mortgages, conveying different property, are given to secure different debts; and the proceeds of the sale of the property conveyed by the first are not sufficient to pay in full the debt secured by it, while the property conveyed by the second brings more than enough to pay the second debt; the mortgagee has no power to apppropriate the excess to the payment of the balance of the first debt, unless the second mortgage expressly authorizes him to do so, nor does the law make such an appropriation of it.

6. *Same; whether lands should be sold in one body, or in parcels.*—As a general rule, where the land is in parcels, distinctly marked for separate and distinct enjoyment, it is the duty of the mortgagee, or person making the sale, to subdivide and sell it in such parcels ; but, where it consists of a single lot, containing ten acres, used and adapted for a family residence, and not shown to have been susceptible of advantageous division, and the mortgagor expresses no desire to have it subdivided, and the mortgage does not stipulate that only so much of it shall be sold as may be necessary to discharge the debt,—this general rule does not apply, and the sale will not be set aside, at the instance of the mortgagor, because the lot was not divided.

7. *Same; inadequacy of price.*—Inadequacy of price is not, of itself, a sufficient ground to induce a court of equity to set aside a sale under mortgage, unless the inadequacy is so great as to shock the sense of justice : where the land is sold for $2,100, and its value is variously estimated by the witnesses at from $3,000 to $4,500, (the evidence preponderating in favor of $3,000,) the sale will not be set aside on account of the inadequacy.

8. *Same; sale of land before slaves.*—Where a mortgage conveys both land and slaves, and two of the slaves are held adversely to the mortgagor, the failure of the mortgagee to sell those two, before resorting to the land, is no ground for setting aside the sale of the land.

9. *Same; sale under execution, by agreement with judgment creditor.*—The mortgagee has no power to substitute, by agreement with a judgment creditor of the mortgagor, a sale under execution for a sale under the mortgage; consequently, his refusal to accede to such an arrangement, when proposed by the judgment creditor, and on his promise that the mortgage debt should be first satisfied out of the proceeds, is no evidence of fraud, and constitutes no ground for vacating the sale.

10. *Annual rests, profits, and interest.*—In taking the account between mortgagor and mortgagee, where the latter is charged with the hire or rents of the property while in his possession, the mortgagor can not complain that the chancellor directed annual rests to be made, and the annual hire to be applied first to the payment of the interest, and the excess to the reduction of the principal.

11. *Exceptions to master's report ; how considered on appeal.*—On appeal from the chancellor's decree, overruling exceptions to the master's

report on a question of fact under a reference, the appellate court will not reverse, unless the record clearly [shows that the master's conclusion is erroneous.

12. *Proceedings in master's office; report, and evidence.*—Under a reference as to a question of fact, or matters of account, the master should report only his conclusions, without the evidence on which they are founded, unless the decree directs him also to report the evidence; nevertheless, he should reduce to writing all examinations taken *viva-voce* before him, and make a note of all the evidence adduced or used on the reference, including such portions of the pleadings and depositions already on file as may be so used; and in stating an account, which consists of numerous separate items, he should append to the account, as stated, a schedule of the particular items in it, and refer in the schedule to the testimony bearing on each item.

12. *Exceptions to report; how taken or reserved.*—It is the duty of the master, on exceptions being made to his decisions, to furnish to the respective parties, on their application, all the evidence that was before him, relating to the matter covered by the exception, for which they may apply; each exception must specify the objectionable item of the report, and point out the evidence on which the party relies to support it; and no evidence, not even the answer, can be considered by the chancellor on exceptions, unless it was given in before the master on the reference. Section 2937 of the Code does not change this practice as previously established.

APPEAL from the Chancery Court of Macon.

Heard before the Hon. JAMES B. CLARK.

THE original bill in this case was filed, on the 8th November, 1853, by Edward F. Mahone, against Wesley Williams, N. J. Scott, and F. W. Dillard. Its object was to set aside a sale of certain lands and slaves, which had been sold by the defendant Williams, under a power of sale contained in two mortgages executed to him by the complainant; to have the property re-sold, under the order of the court, the accounts between the parties adjusted, &c. Scott and Dillard were the purchasers of the property at the mortgage sale,—the former having bought the slaves, and the latter the land; and the bill also prayed an injunction of a judgment at law, which Dillard had recovered against the complainant, in an action for the land.

The first mortgage, which was dated the 9th January, 1851, was given to secure the payment of a promissory note for $6,281 25, executed by said Mahone, dated the 9th January, 1851, and payable to Wesley Williams or bearer,

on or before the 1st January, 1852 ; conveyed to H. L. McGregor, as trustee, sixteen slaves, and a house and lot in the town of Auburn, which was the family residence of said Mahone, and which contained ten acres ; contained a stipulation that, in the event of the death or refusal of the said McGregor to act as trustee, said Wesley Williams should be substituted in his stead, and should have all the powers conferred on him by the deed ; and contained a power of sale, which was in the following words : "Should the said Mahone fail to pay and discharge said promissory note at maturity, then the said H. L. McGregor, as trustee as aforesaid, is hereby fully authorized and empowered to seize and take into his possession the aforegranted premises, and, after giving ten days' notice in three public places in said county, to expose said property to sale in the town of Auburn, at public auction, to the highest bidder, for cash, and, after satisfying said promissory note, and the expenses necessary to the execution and carrying out of this indenture, to return the balance to the said Edward F. Mahone ; and the said trustee is hereby authorized to make all necessary conveyances," &c.

The second mortgage was dated the 5th April, 1851 ; was given to secure the payment of a promissory note for $1200, executed by said Mahone, dated the 5th April, 1851, and payable to Wesley Williams or order, on or before the 1st of January, 1852 ; conveyed two negroes, and two town lots in Auburn, together containing twelve acres, which were not embraced in the first mortgage ; and contained a power of sale, which was in the following words: "Should the said Mahone fail or refuse to pay off and discharge said promissory note at its maturity, then the said Wesley Williams, his heirs, and assigns, is hereby fully authorized and empowered to seize and take possession of said property—lots and negro slaves above-described—and, after giving ten days' notice of the sale, to expose the same to public outcry, in the town of Auburn, to the highest bidder, and, [after] paying off said promissory note, and all expenses incurred in carrying into effect this instrument, to return and pay over to the said Mahone the overplus arising from the sale of said property."

Neither of the mortgages was made an exhibit to the original bill. That bill alleged that, by the terms of the first mortgage, the trustee was authorized and required to first sell the slaves, and, if the proceeds of sale were not sufficient to discharge the mortgage debt, then to sell the land also, and apply the proceeds to the payment of the balance; and that the second mortgage contained the same stipulations. It alleged, also, that the real consideration of the note secured by the second mortgage was $1,000 loaned money, the other $200 being usurious interest on the loan; that the complainant, being unable to pay the secured notes at maturity, procured an extension of the debts until the 1st of January, 1853, and also an additional loan from Williams of several hundred dollars, by agreeing to pay usurious interest at the rate of sixteen per cent. *per annum;* that the debts, as extended, not being paid on the 1st January, 1853, Williams advertised all the property conveyed by the two mortgages for sale on the 12th February, 1853; that the complainant, being compelled by necessary business to be absent in Tennessee at that time, applied to Williams for a postponement of the sale until his return, which Williams promised to grant; that Williams, notwithstanding this promise, went to his house on the day appointed for the sale, and obtained possession of the slaves, by representing to his wife that he intended to buy in the property, and to restore it to her and her family, in order to prevent it from being seized by complainant's other creditors; that all of the slaves were accordingly exposed for sale under the mortgages, except three, (one of whom had died,) and were bid off by the defendant Scott, at the aggregate price of $7,700, which was at least $2,000 less than their real value; that said Scott, in having said slaves knocked down to him, acted merely as the friend and agent of said Williams, and, immediately after the sale, conveyed or delivered them to Williams; that the price at which the slaves were thus sold, though less than their real value, was enough to pay off and discharge the entire amount really due on the secured debts, except a balance of about one hundred and fifty dollars, which could and ought to have been discharged by a sale of the two

Mahone v. Williams.

remaining slaves, without resorting to the real estate; that Williams nevertheless exposed for sale the house and lot conveyed by the first mortgage, and it was knocked down at the price of $2,100, when it was in fact worth $5,000; that the defendant Dillard, who became the purchaser of the house and lot, had knowledge of all these facts showing the invalidity of the sale, and, by agreement with Williams, had never paid any part of the purchase-money; that he had nevertheless instituted an action at law to recover the house and lot, and had obtained a judgment, on which a writ of possession had been issued, &c.

The defendants filed separate answers. Williams admitted the usurious interest alleged to have been included in the note secured by the second mortgage, and the execution of the mortgages as alleged, but denied that the stipulations of the mortgages were correctly stated in the bill, and attached the mortgages to his answer as exhibits; denied that he had ever promised to postpone the sale on account of the complainant's absence; denied that the sale was in any wise fraudulent, unfair, or unauthorized by the mortgages; alleged, as to the two slaves which were not sold with the others, that they were not in his possession, and were adversely held at the time; admitted that, after selling the slaves, the balance due on the mortgage debts was between $230 and $240; admitted that the house and lot were worth about $3,000 at the time of the sale, but averred that the slaves brought their fair market value; denied that either of his co-defendants purchased for his benefit, or at his instance, and averred that each purchased for himself; admitted that, instead of demanding cash from the purchasers, as he might have done, he agreed to give them time, on their promise to pay interest, and insisted that he had a right to do so; admitted that, within two months after the sale, he re-purchased the slaves from Scott, at the same price the latter had bid for them at the sale; admitted that he retained the surplus of the proceeds of sale of the mortgaged property, after discharging the secured debts, and alleged that he did this, by previous agreement with the complainant, that such surplus might be appropriated to the payment of other debts due to him from the

complainant, for money loaned, &c. Scott and Dillard each alleged ignorance of the transactions between the complainant and Williams, except as disclosed by the bill and the answer of Williams; denied the charges of fraud and unfairness in the sale under the mortgage, and asserted the validity and *bona fides* of their respective purchases at the sale.

At the May term, 1854, the defendant Dillard moved to dissolve the injunction on his answer; but the chancellor overruled his motion. At the same term, by leave of the court, the complainant amended his bill, making several alterations which require no particular notice, and adding an averment that the note secured by the first mortgage was given for the price of eighty-three bales of cotton, which the complainant had bought from Williams by the sample, and that Williams had committed a fraud in the sale by misrepresenting the quality and value of the cotton ; but no relief was prayed in reference to this matter, nor were the mortgages made exhibits to the amended bill. Williams, in his answer to the amended bill, admitted the sale of the cotton at the price charged in the bill, but denied all fraud and misrepresentation in reference to it ; and he incorporated in his answer a demurrer to the bill, original and amended, for want of equity, for multifariousness, and because the complainant did not offer in his bill to do equity, by repaying the amount which the defendant had paid for the slaves. Scott and Dillard each filed a formal answer to the amended bill. The chancellor sustained Williams' demurrer for multifariousness, holding that Dillard had no interest whatever in the litigation growing out of the sale under the second mortgage ; but he allowed the complainant to amend his bill, by striking out all the allegations and the prayer relating to that matter ; and the amendment was made as suggested. Another amendment of the bill was allowed in November, 1855, which contained an offer by the complainant to pay whatever balance might be found due to Williams on the statement of the account.

On the 25th January, 1858, Williams filed a cross bill, in which he set up certain proceedings had against him, by

process of garnishment, as the debtor of the complainant, at the suit of Hill, McLean & Co., who were judgment creditors of the complainant, in the United States district court at Montgomery. The garnishment was served on Williams on the 14th February, 1853; and after a judgment *nisi*, by default, had been rendered against him, he appeared, and filed an answer, denying all·indebtedness to Mahone, and alleging that the surplus of the proceeds of sale, which he had retained in his hands, as stated in his answer, after discharging the mortgage debts, had been retained and appropriated, by agreement with Mahone, to the payment of other debts due to him from Mahone. His answer was contested by the judgment creditors, and the issue was found against him by the jury; and judgment was thereupon rendered against him, on the 6th December, 1854, for $2,225 50, the amount then due on the said judgment of Hill, McLean & Co. against Mahone. Williams sued out a writ of error on this judgment, but the judgment was affirmed by the supreme court, at its December term, 1856; and he paid the amount due on the affirmed judgment before filing his cross bill. Mahone answered the cross bill, and admitted all its material allegations as to the proceedings had in the garnishment case; and he demurred to the cross bill on several specified grounds, all of which were overruled by the chancellor.

At the November term, 1859, the cause was argued before the chancellor, and submitted on the pleadings and proof for a final decree; and, by consent of the parties, was held for consideration by the chancellor during vacation. On the 7th February, 1859, while the cause was still held under advisement by the chancellor, the complainant filed a petition, asking that the order of submission might be set aside, and that he might be allowed to amend his bill, by making copies of the mortgages exhibits thereto, and by altering the several allegations which were inconsistent with the provisions of the deeds as shown by the exhibits; and he supported his petition with his own affidavit, and the affidavits of three of his solciitors, in which they stated that the omission and variance were not discovered until pointed out by the opposing counsel in their

argument on the hearing.   In response to this application,
at the ensuing May term, the chancellor made a decretal
order, granting leave to amend the bill; but he annexed, as
a condition precedent, a compliance by the complainant
with the following terms : "1st, that the plaintiff pay all the
unpaid costs of the suit, down to this term, including a so-
licitor's fee and the final record; 2d, that, in the event the
sale of the slaves bid off by Scott should be set aside, and
a redemption or re-sale should be decreed, the defendant
Williams be allowed, in taking the account between him
and the plaintiff, the sum adjudged against him in the gar-
nishment proceedings, with interest thereon, and with the
$360 stated in the fourth paragraph of the cross bill, and
with the two due-bills," (these being the subsequent loans
claimed by Williams, to which he had appropriated the
surplus proceeds of sale,) "with interest on said notes and
due-bills; and that his lien on the slaves be considered as
extended, so as to include said judgment and other moneys;
3d, that the injunction stand dissolved, and the plaintiff
waive any right of appeal; (with the right, however, to
have it restored upon the final hearing, if the chancellor
should so decree; but the plaintiff is not to be dispossessed
of the house and lot, until after the 1st day of December
next;) and that the plaintiff be allowed until the call for
motions to-morrow morning, to determine whether he will
accept these terms, and to pay the costs if he accepts.   In
the meantime, the order of submission will not be set aside,
until these terms are accepted; leaving the case so that, if
the conditions imposed are not submitted to, the court may
proceed to a final decree at this term.   If they are acceded
to, the plaintiff will stipulate accordingly in writing."

The complainant having accepted these terms, and his
acceptance having been entered of record, the order of sub-
mission was set aside, the cause was restored to the docket,
and leave to amend the bill was granted; and the necessary
amendments having been made, the cause was submitted
for a final decree, on pleadings and proof, at the same term.
The chancellor held—1st, that the declarations of Williams,
made before the sale under the mortgage, as to his inten-
tion to buy in the property through the agency of others,

were not competent evidence against either of his co-defendants ; 2d, that these declarations of Williams being excluded as evidence against Scott, the bill must be dismissed as to him ; 3d, that the inadequacy of price was not sufficient to set aside the purchase of the house and lot by Dillard, and the bill must be dismissed as to him ; 4th, that the complainant was entitled to a re-sale of the slaves in the possession of the defendant Williams ; and, 5th, that in the statement of the account between the complainant · and Williams, the latter must be charged with the annual hire of the slaves from the commencement of his possession, and must be credited, in addition to the mortgage debt, with the several sums specified in the terms which the complainant had accepted.   He therefore ordered a statement of the account by the master, according to the principles · settled by the decree, and directed him to report to the next term.   The master filed his report at the next term, to which several exceptions were reserved by each party.   The chancellor overruled all the exceptions, and confirmed the report; and he ordered a sale of so many of the slaves as might be found necessary to discharge the balance found due to the complainant.

The appeal is sued out by the complainant, who makes fifty-one assignments of error, founded on the final decree on the merits, the several interlocutory orders of the chancellor, and his rulings on the numerous exceptions reserved by the complainant to the decisions of the register on the reference.

W. P. CHILTON, and GUNN & STRANGE, for appellants.
CLOPTON & LIGON, contra.

· A. J. WALKER, C. J.—A necessary amendment of the complainant's bill was allowed after the cause had been heard and submitted for a decree.   The chancellor prescribed certain conditions precedent to the allowance of the amendment, to which the complainant formally assented. We decline to revise the action of the chancellor in imposing those conditions, and proceed to submit our reasons.

The third section of an act approved February 8th, 1858,

directs the allowance of amendments for certain purposes, at any time before final decree, "upon such terms as the chancellor shall deem just and equitable"—Pamphlet Acts, 1857-8, p. 230. This act, under which the amendment here was allowed, very clearly refers the question of terms to the chancellor's discretion. Many acts, done under discretionary powers, are revisable. Thus, decrees in suits for specific performance, and decrees fixing the amount of temporary alimony, are revisable, notwithstanding they are referred to a discretionary authority.—*Pulliam v. Owen*, 25 Ala. 492; *Jeter v. Jeter*, 36 Ala. 391. But, as a general, if not a universal rule, that discretionary authority, which a court, having original cognizance of a cause, exercises over the questions arising during its progress, and pertaining to its conduct, is not revisable. Examples of such questions occur in applications for continuances, filing pleas, amendments of pleadings, extensions of time to answer interrogatories, changes of venue, new trial, &c.— *Banks v. State*, 28 Ala. 28; *Starr v. State*, 25 Ala. 449; *Evans v. Bolling*, 5 Ala. 550; *P. & M. Bank v. Walker*, 8 Ala. 926; *Pool v. Harrison*, 18 Ala. 514; *Hill v. Bishop*, 2 Ala. 320; *Goldsmith v. Picard*, 27 Ala. 142; *Zeigler v. Hall*, 23 Ala. 127; *Prater v. Miller*, 25 Ala. 320; *Brister v. State*, 26 Ala. 107; *Gayle v. Bancroft*, 22 Ala. 316; *Goodwin v. Harrison*, 6 Ala. 438; *Franklin v. State*, 29 Ala. 14; *Walker v. Blassingame*, 17 Ala. 810; *Tate v. Gilbert*, 2 Porter, 386; *Martin v. Dortch*, 1 Stew. 479; *Clason v. Shotwell*, 12 John. R. 49; *Marine Ins. Co. v. Hodgson*, 6 Cranch, 206.

The discretionary authority of prescribing the terms of an amendment falls within the general rule above stated, and within the principle and reason of the decisions above cited. The chancellor, in prescribing the terms of an amendment, may properly be influenced by considerations referring to the conduct of the parties as observed by him, and not clearly patent on the record; and, besides, the terms themselves are, with great propriety, generally made to relate to the prosecution of the suit, and are usually executed, so that the parties could not, after a reversal, be placed in *statu quo*. It is true, that the power may be abused; but the same thing is true of many other powers

which are universally conceded not to be revisable. No power is more susceptible of abuse, than that of deciding whether new trials shall be granted, or prescribing the terms of their allowance. The same thing may be said of the power, in criminal cases, to fix the period of imprisonment within the prescribed limits. Appellate courts must act upon the presumption, that those who preside below exercise their great powers for the promotion of justice and right.

[2.] As a condition precedent to the allowance of the amendment, the plaintiff was required to give a written consent to certain specified terms, which he gave, and thereby procured leave to amend. He is bound by the consent so given.— *Waller v. Sultzbacher & Paige*, 38 Ala. 318. The consideration of the questions arising upon the demurrer to the cross bill, is unnecessary. So much of the relief asked by the cross bill as the chancellor granted, was within the terms of the complainant's consent. All the relief so granted may be attributed to the consent; and the decree, so far as it grants that relief, must be approved, upon the authority of the maxim, *"consensus tollit errorem."*

[3.] A material question in the case is, whether the purchasers are affected by declarations proved to have been made by Williams, who sold to them by virtue of a power of sale conferred by the mortgage to him. It is very clear that the declarations made after the sale would not be evidence against the purchasers.—See the cases collected in Shepherd's Digest, 586, §§ 37, 38, 42. The declarations of a vendor, in disparagement of his title, made before the sale, are admissible as against the purchaser.—*Pearce v. Nix*, 34 Ala. 185; *Grayson v. Glover*, 33 Ala. 182; *Lide v. Lide*, 32 Ala. 449; *Cole v. Varner*, 31 Ala. 250; *Miller v. Jones*, 29 Ala. 174; *Gillespie v. Burleson*, 28 Ala. 551; *Jennings v. Blocker*, 25 Ala. 415; *Mobley v. Barnes*, 26 Ala. 218; *S. C.*, 21 Ala. 239; *Brewer v. Brewer*, 19 Ala. 481; *Fontaine & Dent v. Beers*, ib. 722; *Horton v. Smith*, 8 Ala. 73; *Nelson v. Iverson*, 17 Ala. 221; *Weaver v. Yeatman*, 15 Ala. 539; *Sally v. Gooden*, 5 Ala. 78. These declarations must be against the declarant's interest, and there must be an iden-

tity of interest with the person against whom they are offered in evidence.

The declarations made by Williams before the sale, relate alone to his intentions as to the manner of conducting the sale, and the ulterior purposes contemplated by him. They indicated a design to become, through the agency of others, the purchaser at his own sale, to restore the property to the mortgagor or his wife, and to prevent the mortgagor's creditors from reaching it. These declarations do not disparage the mortgagee's title, in the validity of which the purchasers have an identity of interest with him, and could not be said to be against the interest of himself, as he stood at the time of making the declaration, the holder of a mortgage title. There are cases which hold such declarations admissible.—See 1 Phillipps on Evidence, C., H. & E.'s Notes, 318. We can not so regard them. They seem to us not to be within the rule, or the reason of it. They do not concern the estate, but merely announce the declarant's intention as to a future sale of it. At all events, the question is settled in this State, by that class of decisions which hold, that where there is a question of fraud, a purchaser is not affected by his vendor's declarations, unless under special circumstances which exempt them from the operation of the general rule.—*Smith v. Rogers*, 1 S. & P. 317–322; *Borland v. Mayo*, 8 Ala. 104–112; *Abney v. Kingsland*, 10 Ala. 355; *Newcombe v. Leavitt*, 22 Ala. 631–641. In determining the rights of the purchasers at the sale, the antecedent declarations of the mortgagee must be excluded from view.

In the absence of the mortgagee's declarations, there is nothing to impeach the fairness of the sale of the negroes bought by Scott. The chancellor committed no error in dismissing the bill as to him. Besides, the complainant's relief has not been impaired by the dismissal as to Scott, if Williams is responsible for the decree against him; for Scott conveyed the negroes purchased by him to Williams, and the chancellor, after dismissing the bill as to him, set aside his purchase upon the evidence of Williams' declarations, which were allowed full effect against the declarant himself. No greater or different relief could have been granted, if Scott had remained a party.

[4.] The sales of property by the mortgagee were, pursuant to the power, for cash. The arrangement of the mortgagee with a purchaser of the property, to allow him time on the sums due for his purchases, whether made before or after the sale, could not injure the mortgagor. Its tendency was rather to increase the number of bidders, and to enhance the price. We find, therefore, in that arrangement, no ground for vacating the sale.

[5.] We now proceed to consider the material questions which concern the sale of the real estate. Two mortgages were given by the complainant to the defendant Williams: the first to secure a debt for $6,281 25 ; the second to secure the re-payment of $1,000 loaned, which is enlarged to $1,200, the amount specified in the note, by the addition of usurious interest. Each of the mortgages embraced land and negroes. Some of the negroes conveyed by the mortgages were sold before the land. The land described in the first mortgage, consisting of a house and lot contiguous to the town of Auburn, was sold to the defendant Dillard. That sale is assailed, first, upon the ground, that the sale of the slaves discharged the mortgage debt, and that there was no debt remaining when the land was sold. The sale of the negroes embraced in the first mortgage discharged all the debt secured by it, except about $231 57. The sale of slaves embraced in the second mortgage produced an excess of $211 80 above the amount of the debt secured by it, with legal interest. It is thus shown that the property sold under the first mortgage did not discharge it. But it may be said, that the excess produced by the sale under the second mortgage should have been appropriated to the payment of the balance which remained on the first mortgage. If that had been done, there would still have remained due on the first mortgage, $19 77. Therefore, even upon the hypothesis of such an appropriation, the first mortgage was not discharged by the sale of the slaves.

But the concession, that it was the duty of the mortgagee to make the appropriation, leaves him in the attitude of having sold a valuable lot of ten acres to satisfy a paltry debt of less than twenty dollars. The property embraced in the two mortgages was distinct. The first mortgage did

not embrace the property conveyed by the second. The mortgagee had, therefore, no authority over the property in the second mortgage, or the proceeds of it, except such as was bestowed by the instrument itself. That authority was to sell, appropriate the proceeds to the payment of the debt secured by it, and pay over the excess to the mortgagor. He had no power to appropriate the excess to the payment of another debt, secured by another mortgage. For the excess in his hands, he was the debtor of the mortgagor, and the existence of such counter claim did not discharge the debt secured by the first mortgage. There is a broad distinction between a set-off and a payment. While the mortgagor would have a right of set-off, against that, or any other debt due to the mortgagee, the law did not appropriate the counter claim, or require the mortgagee to appropriate it, to the payment of the mortgage debt.—See *Green v. Stone*, 3 Sandf. Ch. R. 305, where the point is decided. There was, therefore, left due on the first mortgage, after the sale of the negroes, the sum of $231 57. This sum the mortgagee had a right to raise out of the real estate.

[6.] To satisfy the balance of $231 57, the mortgagee sold a house, and the lot upon which it was situated, containing ten acres. This house and lot, which were sold for two thousand one hundred dollars, are alleged by the complainant to have been worth five thousand dollars, are admitted to have been worth three thousand dollars, and are variously estimated by the witnesses at $4,500, $4,400, $4,000, and $3,000. Perhaps, a larger number of witnesses concur in the estimate of $3,000 than any other, and perhaps there is a preponderance of evidence in favor of that sum. Upon these facts, objections are made to the sale, because the whole lot was sold to satisfy a small sum, which the sale of a small portion would have sufficed to discharge; because the sale was made for an inadequate price; because all the negroes conveyed by the mortgage were not sold before resort was had to the land; because the sale was made, to the complainant's detriment, in his absence; and because the purchase was made for the benefit of the mortgagee.

The power of sale in the mortgage bestows authority to sell the property, and with the proceeds of the sale discharge the debt, pay the expenses of sale, and pay over the balance to the mortgagor. The disposition of the excess after paying the debt and expenses shows that a realization of a sum above the amount required to pay the debt was contemplated. It differs, therefore, from powers to sell so much land as will pay a given sum of money, where the quantity to be sold is governed by the sum to be raised; and the decisions in reference to such powers afford but little, if any, illustration of the question in hand.— *Stead v. Course,* 4 Cranch's R. 403; *Wakefield v. Campbell,* 20 Maine, 393. The land was more than sufficient to pay the debt in this case; and it differs from the case where the power is to sell so much as would pay a debt, and there has been a sale of a parcel inadequate to pay the debt.— *Quarles v. Lacy,* 4 Munf. 251. The point here is as to the sale of an entire tract, to pay an amount much less than its value, where there is a power to sell the tract in general terms, and to pay over the proceeds to satisfy the debt and expenses, and the excess to the mortgagor.

Chancellor Kent lays down the rule, that where a tract of land is in parcels, distinctly marked for separate and distinct' enjoyment, it should be sold by parcels.— *Wood v. Monell* 1 Johns. Ch. R. 502; *Woodhull v. Osborne,* 2 Edw. Ch. 614 · *Rowley v. Brown,* 1 Binney, 61. This general rule rests upon the reasonable presumption, sanctioned by observation and experience, that such property will produce more when sold in parcels, because the sale is thus accommodated to the probable wants of purchasers. If there is no division of the tract into parcels, adapted for separate and distinct enjoyment, it is generally a reasonable requisition, that the party interested should show to the trustee, or officer selling, by a map or diagram, or in some other intelligible manner, the distinct parcels into which the land might be profitably divided for sale. Accordingly we find that, in some cases, stress is laid upon an omission in this respect, where the regularity of a sale is questioned.— *Wood v. Monell, supra; Woodhull v. Osborne, supra.*

It is the primary duty of one charged with making a sale,

14

to adopt the mode which will probably command the best price, and to exercise his best judgment in determining what is the mode likely to accomplish that end ; and a sale in a manner variant from that which was known to be most likely to produce the largest price, would be sufficient reason for avoiding the sale. So, also, a failure to sell in the mode which a reasonable exercise of the seller's judgment would have shown to be the most probable means of bringing the largest price, would be a good ground of objection to a sale, where the price was altogether inadequate.—*Hewson v. Daggert*, 8 Johns. R. 257 ; *Stall v. Macalaster*, 9 Ohio, (Ham.) 19–24; *Gray & Howard v. Shaw*, 14 Missouri, 341 ; *Ord v. Noel*, 5 Madd. R. 438. A mere error of judgment in the selection of the mode of sale, whereby some injury may probably have resulted, ought not to be any ground for the avoidance of a sale. If it were, all certainty and stability would be stripped from such sales, and their validity would depend upon mere vague speculation. The rule which we have deduced from Chancellor Kent's opinion is a general one, adopted because it will lead usually to a correct solution of the question whether a sale should be by parcels, and designed to aid in determining whether a sale should be avoided because it was not made in that manner.

We may now look at the facts, and, in the light of the principles which we have announced, decide whether the sale of the land ought to be avoided. The lot, having an area of ten acres, was in a rectangular form, and, being contiguous to town, was used as a place of family residence. Its chief value resulted from its suitableness for a family residence. The dwelling-house was situated upon the western part of the lot ; and the stable and cattle lot appurtenant to it, with a steep hill, and a branch or swamp, were upon the eastern part of the lot. The witnesses testify, that the lot might have been bisected into parcels of five acres. This would have separated the dwelling from the stable and cattle lot, and cut off for distinct sale a lot of five acres, with stable, steep hill side, and branch or swamp. No line of division was drawn across the lot. All its parts were in their use, tributary in common to the single purpose of a

residence. It was in a condition precisely the opposite of a tract "in parcels, distinctly marked for separate and distinct enjoyment," and, therefore, does not present the circumstances under which the general rule above stated requires a sale to be made in parcels.

The mortgagor afforded no information, by diagram, or map, or otherwise, of any separation, or susceptibility of separation, into parcels; nor does it seem that he indicated any wish for a sale in parcels, nor any opinion that such a mode of sale would be advantageous. It is, however, alleged as an excuse for his failure to do so, and also as an independent objection to the sale, that he was absent, and that the sale was made in violation of an agreement for its postponement until his return. The complainant was absent in another State at the time of the sale; but he was notified of the appointment of the day of sale before he left, and his allegation of an agreement to postpone the sale until he returned is denied by the answer, and not sustained by any proof. So he stands before us as inexcusably absent from the sale, and failing to inform the mortgagee of his desire for a sale by parcels, and to show that such sale could be advantageously made. The testimony is conflicting as to the susceptibility of an advantageous division of the lot for the purposes of the sale. A number of witnesses testify in favor of the affirmative of the question. Quite a number testify to the contrary, and give reasons which very strongly persuade us of their correctness. Reasoning from the nature of the lot, and of the uses to which it was appropriated, and for which it was fitted, and weighing the conflicting testimony bearing directly upon the point, we are made to doubt strongly, whether injury would not have resulted from a division of the lot and a sale of a part of it. We certainly are far from being affirmatively convinced, that any advantage would have resulted from such a course. We must decide, that the sale was not voidable because the entire lot was sold. The land was sold for $2,100, while it was worth certainly $3,000, perhaps more. We think it altogether probable that the injury to the complainant would have been still greater, if a part of the lot had been sold. There is

nothing in the testimony which shows that any deprecia-
tion of price resulted from the mode of sale adopted.

[7.] Inadequacy of price is not, of itself, a ground for the
vacation of a sale, unless it is so gross as to shock the
sense of justice.— *Williamson v. Dale*, 3 Johns. Ch. R. 290;
*Livingstone v. Byrne*, 11 Johns. Rep. 555; *American Ins.
Co. v. Oakley*, 9 Paige, 259; *Judge v. Wilkins*, 19 Ala. 765.
The inadequacy of consideration here does not justify a
vacation of the sale.

The purchaser of the land, Dillard, cannot be affected
by the declarations of Williams. This results from a prin-
ciple hereinbefore settled.

[8.] The mortgagee's failure to sell all the negroes, before
resorting to the land, is urged as an objection to the sale.
There is no merit in the objection. The mortgagee sold all
the negroes of which he had possession; and the others
were either dead, or adversely claimed; and the latter could
not have been sold for a reasonable price, even if they be-
longed to the complainant, and could have been gotten into
possession by the mortgagee.

[9.] An attorney, controlling an execution on the mort-
gagor, proposed to sell the land under the execution, and
to discharge the balance due on the mortgage, after the sale
of the negroes, out of the proceeds of the sale of the land.
This proposition, Williams, the mortgagee, rejected; and
his rejection of it, in our opinion, is no evidence of fraud,
nor ground of objection to the sale. He had no right, by
an arrangement with a third person, to substitute a sale un-
der execution for the sale under mortgage, as the means of
collecting his debt.

We do not deem it necessary to notice other points in
the argument, in favor of vacating the sale of the land.
We find, neither in them, nor in those we have noticed,
sufficient reason for setting aside the sale of the land.

We concur in the chancellor's conclusion, that the proof
does not sustain the charge of fraud in the sale of cotton,
in consideration of which sale the complainant's note was
given.

[10.] The chancellor, in his decree settling the principles
upon which the account should be taken, directed the regis-

Mahone v. Williams.

ter to charge the mortgagee with the hire of the slaves from the commencement of his possession, and to make annual rests, and appropriate the annual hire, first, to the discharge of the interest, and then to the reduction of the principal. There are authorities which hold, that the mortgagee should not be charged with interest on the annual profits.—*Morrow v. Turney*, 35 Ala. 139 ; *Hogan v. Stone*, 1 Ala. 496 ; *Walton v. Witherington*, 9 Missouri, 545. The chancellor has followed the general rule, which governs in taking an account between mortgagor and mortgagee, and which is consistent with our statutory mode of computing interest ; and he certainly committed no error.—Code, § 1522 ; 3 Powell on Mortgages, 956, 957, 958, and notes ; 1 Hill on Mortgages, 424, 420 ; *Shephard v. Elliott*, 4 Mad. R. 254 ; *Quarrel v. Beckford*, 1 Mad. R. 269, 274. The question has been between allowing no interest on the annual profits, and computing interest upon the plan adopted by the chancellor. It seems never to have been supposed that a mortgagor had any cause of complaint, where the chancellor's mode of computation was adopted.

[11.] The complainant excepted to the value of the hires of the slaves, as determined by the register ; the chancellor overruled the exception, and we are now called upon to revise the register's decision. The rule is to indulge all reasonable presumptions in favor of the register's decision upon questions of fact, such as those now under consideration, and not to reverse it unless clearly satisfied that it is wrong. Judge Story goes so far as to say, "that the court must be clearly satisfied that there has been an unquestionable error."—*Donnell v. Col. Ins. Co.*, 2 Sumner, 366, 371 ; *Kinsey v. Kinsey*, 37 Ala. The testimony as to the annual value of the slaves is conflicting, and voluminous. We have made an examination of it. No two minds would ever draw the same conclusion from it. As the result of our examination, we feel no full conviction that the register's conclusion is wrong. His conclusions are not unreasonable. It does not appear to us that they are plainly wrong ; and, therefore, we will not reverse the chancellor's decree confirming the report.

[12–13.] We have taken upon ourselves the labor of

nvestigating, as well as we could, the vast number of questions of fact supposed to be presented by the complainant's exceptions. We do not think, however, that the evidence and the exceptions were brought before the chancellor in such a manner as to make it his duty to revise the report, so far as the register's decisions on the question of hire are concerned; nor do we think it is our duty to revise those decisions. For the purpose of establishing and preserving a correct practice, it is proper for us to announce the rules which are disregarded in the register's proceedings, and by the party excepting.

The register states in his report the aggregate of the hire of all the negroes, some fourteen or fifteen in number, for each one of the several years through which the account runs, without affording any means of ascertaining what was his decision as to the distinct value of the several negroes. He reports testimony; but it does not appear whether that which he reports is all that was before him; and we suspect that he reports only so much of the evidence as was taken on oral examination before him, omitting the depositions bearing on the subject of the report, which had been taken before the hearing, and which are found in the transcript. The complainant excepts to the report, on the ground that the amount allowed on account of hire by the register was less than the proof authorized. It was improper for the register to report the evidence at all. The decree did not require him to report the evidence; and that being the case, it was his duty, according to the general rule, which prevailed in English practice, simply to state the facts found by him, as is done in a special verdict, and it was irregular for him to report the evidence. That practice has been recognized and pointed out as the correct mode of proceeding, by our decisions.—1 Hoffman's Ch. Pr. 545; 2 Dan. Ch. Pl. & Pr. 1480, 1481, n.; 2 Smith's Ch. Pr. 162; *In the matter of Hemiup*, 3 Paige's Ch. R. 305; *Mott v. Harrington*, 15 Verm. 185, 197; *Darrington v. Borland*, 3 Porter, 9, 39; *Kirkman v. Vanlier*, 7 Ala. 217, 227; *Alexander v. Alexander*, 8 Ala. 796, 805; *Kinsey v. Kinsey*, 37 Ala. 393.

It is the duty of the register, upon the application of

the parties, to furnish the evidence appertaining to the matter of exception.—See the authorities last cited; also, *Donnell v. Col. Ins. Co.*, 2 Sum. 371; 2 Smith's Ch. P. 376; *Harding v. Handy*, 11 Wheaton, 126. The respective parties should specify the testimony, upon which they rely to support and resist the exception.—See same authorities; also, 2 Dan. Ch. Pl. & Pr. 1497, *n*. 2; *Pearson v. Darrington*, 32 Ala. 227. The register could, under the English practice, always have the means of furnishing the evidence; for, originally, the examination in the register's office was upon written interrogatories, and the rule adopted in 1828, which allowed *viva-voce* examinations, required that the testimony should be taken down.—2 Dan. Pl. & Pr. 1387; *Remsen v. Remsen*, 2 Johns. Ch. R. 495–499; *Kirkman v. Vanlier*, 7 Ala. 228. Our statute (Code, § 2934), which authorizes *viva-voce* examinations, has omitted to require that the testimony be taken down in writing. But we must take the " *analogy* " of the English rules of practice adopted as late as 1845.—See 7th Rule of Practice, 24 Ala. VII. By analogy to the English practice, prevailing long before 1845, it must be held to be the duty of the register, in this State, to take down the examinations in his office in writing.

The chancellor seems to have been of opinion, that the only mode of revising the register's decisions upon questions is by reserving "in writing the points arising on a reference," as authorized by section 2937 of the Code. The chancellor expressed the same opinion in *Kinsey v. Kinsey, (supra,)* where we adopted a different view of the subject. We did not then, and do not now, think the Code was designed to abolish the established mode of revising the decisions of the register upon questions of fact referred to him. The proper practice is, for the register to take down in writing the testimony taken before him, and, upon exceptions made, furnish all the evidence in reference to the exception for which the parties may apply, and that the parties shall specify the evidence upon which they respectively rely. Each exception itself should designate the objectionable item, and point to the evidence by which it is designed to support it.—*Harding v. Handy*, 11 Wheaton, 126; *Darrington v. Borland*, 3 Porter, 39; *Story v. Livingston*,

13 Peters, 366. No testimony can be considered upon exceptions to the register's report, unless it was given in before him. Not even the answer can be considered, unless it was read in evidence before the register.—2 Daniell's Ch. Pl. & Pr. 1498. It is, therefore, necessary for the parties to give in evidence such parts of the pleadings and proofs taken before the hearing, as they may deem material. Neither the register, nor the chancellor, is to be required to search through the entire file, for the evidence pertaining to the questions arising on the reference. The register must make a statement as to what evidence was given in before him, in order that he may be able to furnish copies to the parties on their application.

The register in this case very properly reports the results of his inquiry, without going into detail. But he should have appended a schedule of the particular items in the account as settled, and in it refer to the testimony on each item, and refer to that schedule in his report. In omitting to do this, and in affording the chancellor no means of ascertaining his decisions upon the different items of hire, he has committed an error.—2 Dan. Ch. Pl. & Pr. 1481. The complainant should have objected to the report, for that error, in the court below, if he sustains any injury from it; and there a remedy might have been afforded. What is the effect of the violation of the rules of practice in this case? The court is to revise the register's several decisions upon a number of questions of fact, equal to the number of negroes multiplied by six, the number of years for which the hire was to be ascertained. These questions are to be considered and decided as original propositions, without any knowledge of the decision of the register upon any one of them. The court is not informed, with any degree of certainty, as to what evidence was read before the register. If the chancellor indulges the conjecture that the register decided in reference to all the evidence pertaining to the matters of inquiry, which was taken before the hearing, and which was taken upon the reference before him, then he must take up, one by one, the vast number of questions, and look through the transcript, and select from the numerous depositions the different parcels of testimony bearing

upon the different questions as he takes them up, and make up the best decision he can.   And when he has done this, he does not know whether his decision upon any particular item is concurrent with that of the officer whose judgments he is revising.   The object of a reference to the register is to aid the chancellor.   But the reference certainly can neither enlighten him, nor facilitate his labors, if he is left as in this case, to consider all the questions as original propositions, and search through the file for the evidence bearing upon them.   Indeed, it would have been obviously better for him to have had no reference, and to have required the parties to come before him and produce the testimony bearing upon the different items.

In order still further to illustrate this subject, we extract some strong expressions relating to it from the opinions of distinguished judges.   Chief-Justice Marshall says : " It is not the province of a court to investigate items of an account.   The report of a master is received as true, when no exception is taken ; and the exceptions are to be regarded only so far as they are supported by special statements of the master, or by evidence which ought to be brought before the court by reference to the particular testimony on which the exceptor relies.   Were it otherwise—were the court to look into the immense mass of testimony laid before the commissioner, the reference to him would be of little avail.   Such testimony, indeed, need not be reported, farther than it is relied on to support, explain, or oppose a particular exception."—*Harding v. Handy, supra.*   Judge Story, in *Donnell v. Col. Ins. Co., (supra,)* remarked : "When exceptions are taken, the evidence, which furnishes the ground of the exception, should be required by the party excepting to be stated by the master ; for, otherwise, the court will not wander at large into the evidence, in order to ascertain whether by possibility the master was wrong in his conclusion or not."   And it is held in *Story v. Livingston,* (13 Peters, 366,) that "exceptions to a master's report must state, article by article, the parts of the report which are intended to be excepted to."

We have more than once overlooked the grossest irregularities in the proceedings in reference to matters of account

before the register, and in his report of those proceedings, and in the exceptions to it. We observe with regret there is a growing inattention to the rules which govern in such matters, and that there is imminent danger that the administration of substantial justice by the chancellors, or in this court upon appeal, will be rendered utterly impracticable, unless the increasing evil can be remedied. We have therefore endeavored in this case to set forth, with more than usual particularity, some leading rules and principles, an attention to which will simplify the practice, facilitate and aid in the administration of justice, alleviate the labors of the court, and enable the chancellor and this court on appeal to give to each assailed decision of the register an intelligent and satisfactory revision. If the registers and solicitors in the court below are held to a strict observance of the rules, it will lead to a salutary reform of the present careless practice, and be productive of much good. It would be peculiarly gratifying to us if this should be the last case in which we shall be precluded from making a satisfactory revision of each decision of the register, which is the subject of an unsustained exception.

We do not perceive any evidence in the record that the register refused to permit the examination of Ousley; or, if he had done so, that an error was committed by the register to the appellant's prejudice; or that there was any objection to the ruling of the register in reference to it.— *Kinsey v. Kinsey, supra; Pearson v. Darrington*, 32 Ala. 263.

If any error was committed in the rulings against the complainant upon the evidence, the result has not been thereby affected.

The decree of the chancellor is affirmed.